The **UNITED STATES**

v.

**William Richard GOSLEE.**

Crim. No. 74–157.

United States District Court,
W. D. Pennsylvania.

Feb. 14, 1975.

David M. Curry, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Paul Bogdon, Pittsburgh, Pa., for defendant.

## OPINION

SCALERA, District Judge.

Following conviction by a jury on two counts of uttering and publishing a forged endorsement on a United States Government check, defendant moved for judgment of acquittal and a new trial.

The evidence indicated that two United States Government checks, one in the amount of $148 made payable to Charles Dennis, and another in the amount of $174 made payable to Edward Griffith, were cashed at a supermarket in New Castle, Pennsylvania. When each check was cashed, a Regioscope photograph was taken of the check and the person who presented it for payment. George Kennedy, a New Castle police officer, identified the defendant as the person in the photograph of the Dennis check, and said he believed, though he was not positive, that defendant was the person in the photograph of the Griffith check.

When the checks did not arrive when due, Dennis and Griffith notified the Check Claims Division of the United States Treasury Department. The Division sent Dennis and Griffith a check claim form which they answered and returned.

Defendant presents three propositions in support of his motion.

### I

Defendant objects to the admission into evidence of the two Regioscope photographs. The exhibits were actually a photograph on a photograph: a photograph of a check superimposed on a photograph of a man. The checks are the two United States checks in evidence. The man, identified at trial as the defendant, is the one who presented the checks for payment.

The government introduced the Regioscope photographs through Thomas A. Joseph, an owner and operator of the supermarket where the checks were cashed. Joseph testified that a customer who wanted to cash a check would go the cashier's office in the front of the store. An employee would stamp an identification number on the face of the check, place the check on a ledge and simultaneously photograph it and the customer. The customer would endorse it in the presence of the employee and receive payment.

The equipment used in taking the Regioscope photographs was installed in the store by Filmdex, an independent contractor. Filmdex supplied and developed the film used in the store camera and also made periodic inspections of the equipment. The system was installed, Joseph testified, "to get rid of bad checks."

Though he could not be positive, Joseph said the checks were probably cashed by a long-time employee named Viola Toshe. He testified that Toshe's primary function was to cash checks, and that she understood how the Regioscope equipment was operated. He did not oversee her work and did not see her cash the checks. Toshe died prior to trial.

When the government notified him that the checks were paid over a forged endorsement, Joseph asked for and received from Filmdex the Regioscope photos. Because the identification number on the face of the checks pictured in the photographs were the same as those stamped on the checks that were admitted into evidence, Joseph said he was able to testify that the photographs were taken when the checks were cashed. When asked whether the photographs were taken in his store, Joseph answered in the affirmative, noting there were items in the photographs that could be found only in his store.

Defendant contends that the Regioscope photographs should not have been admitted into evidence. For a photograph to be admissible, defendant argues, it must be identified by someone who observed the scene and events portrayed, and testifies that the photograph accurately depicts that scene. Here, the only person who could have observed the scene and the events, the employee who cashed the check, did not testify.

Generally, photographs have been considered only as a supplement to a witness, a pictoral illustration of the witness' testimony. Under this view, a photograph is admissible only when a witness testifies that it is an accurate representation of what he has personally observed. McCormick on Evidence, p. 531 (2d Edition, 1972). This position is illustrated in a number of cases involving photographs taken by a bank surveillance camera. Courts have admitted these photographs only when witnesses have testified that they accurately depict what was happening in the bank at the time the photographs were taken. United States v. Wilkins, 477 F.2d 323 (8th Cir. 1973); United States v. Hobbs, 403 F.2d 977 (6th Cir. 1968); United States v. Kelley, 334 F.Supp. 435 (S.D.N.Y. 1971).

This view is overly restrictive. Photography long ago progressed to the point where the courts can rely on its work. One could even argue that a properly authenticated photograph is more reliable than the oral testimony of a witness, and that it is also more effective.

In recent years, the courts have liberalized their stance on photographs and suggested an alternative view as to their admissibility. This so-called "silent witness" theory is based on the notion that a photograph is reliable enough to be admitted into evidence. Under this theory, when an adequate foundation is provided to assure the accuracy of the process producing the photograph, the photo-

graph can be admitted to speak for itself, even though no witness has vouched for its accuracy. 3 Wigmore, Evidence § 790 (Chadbourn rev. 1970).

It has been noted that X-rays are admitted under this alternative view. No one could verify that an X-ray, of a wrist for example, is accurate. Nonetheless, because the X-ray process is considered to be accurate and reliable, the courts routinely admit X-rays. McCormick on Evidence, p. 532.

Employing this alternative view, one state court has admitted Regioscope photographs. In a forgery case, the prosecutor offered a photograph, taken by a process quite similar to that used in the instant case. A teller testified that she always took a photograph when cashing a check. She did not recall the transaction in question. An officer of the firm that installed the process testified as to how it worked. Though there was no one who could say that the photographs accurately depicted the scene portrayed, the court admitted them into evidence. State v. Tatum, 58 Wash.2d 73, 360 P.2d 754 (1961).

In United States v. Diggs, 423 F.2d 1194 (4th Cir. 1970), the government, in making out its case for uttering of a forged endorsement on a United States Treasurer's check, offered a Regioscope photograph allegedly showing the defendant with the check at the moment it was cashed. The witness (apparently the owner of the store where the check was cashed) could not positively state that the photograph was made in the store and portrayed defendant cashing the check. He could identify the check in the photograph on the basis of an identification number stamped on the check. Defendant claimed an insufficient foundation was laid for the photograph. In a brief, per curiam decision, the Fourth Circuit held that the foundation was sufficient and that the admission of the photograph was proper.[1]

1. In United States v. Moseley, 450 F.2d 506 (5th Cir. 1971), the government offered so-called Dubl-Check photographs, or split-frame photographs of a person presenting a

check for payment and his identification credentials. Testimony offered as a foundation for the photographs was not discussed in the opinion. On appeal, defendant argued that

▪▪ This court agrees that a photograph, after a sufficient foundation is laid, can be admitted to speak for itself. And we find that a sufficient foundation has been presented as to the two Regioscope photographs at issue. Joseph explained in detail the procedure used in cashing checks and what part the photographic system played in that procedure. According to his uncontradicted testimony, this procedure was generally followed. It was probably a long-time employee experienced in working the photographic equipment who cashed the checks and took the photographs in question. The photographic system itself was installed and maintained by an independent contractor who was skilled in photography. The identification numbers stamped on the checks pictured in the photographs were identical to those on the two checks admitted in evidence. And Joseph testified that background matter in the photographs satisfied him that the photographs had been taken in his store.

The Regioscope photographs were properly admitted.

## II

The government introduced a check claim form submitted to the United States Treasury Department by Edward Griffith. Secret Service Agent O'Neill identified the form. He testified that when the Treasury Department learns that a United States Government check is overdue, the department issues a stop-payment order on that check. Then the department sends the payee a check claim form, containing questions concerning the non-receipt of the check. The payee is asked to answer the questions and return the form to the Treasury Department. The Treasury Department forwards the claim form to the appropriate Secret Service Office in the locality where the check was mailed.

Agent O'Neill identified the claim form that was submitted to the Treasury Department by Griffith and forwarded in the normal course of business to the Pittsburgh office of the Secret Service. The claim form was admitted. Defendant objects.

Government records are admissible, defendant argues, when it is shown they are authentic and that they were kept in the regular course of business. Agent O'Neill, presumably because he was not at the Check Claims Division in Washington when the claim form was sent and received, was not in a position to testify to either factor, and the claim form should not have been admitted solely on the basis of his testimony.[2]

▪ In his brief, defendant concedes the point that the claim form is admissible under the official records exception to the hearsay rule. The claim form is also admissible under the business records statute, which does apply to records prepared in the ordinary course of business of federal agencies. Kemerer v. United States, 330 F.Supp. 731 (W.D. Pa.1971), affirmed 474 F.2d 1338 (1971).

▪ In order for a government record to be admissible, it is not required that it be identified by its maker. The business records statute was designed to eliminate such a requirement. United States v. Johns-Manville Corporation, 231 F.Supp. 690 (E.D.Pa.1963).

▪ What is necessary is sufficient testimony to explain how the records were prepared, *Johns-Manville*, supra, and to guarantee their reliability. United States v. Whitaker, 372 F.Supp. 154 (M.D.Pa.1974). The person identifying the records must be in a position to testify to the process. In assessing whether the authentication is sufficient, the court should consider the testimony of the person offering the record, his

---

the trial court abused its discretion in admitting the photographs. The Fifth Circuit disagreed, stating briefly that the conditions under which the photographs were taken

were adequately explained by the government's witnesses.

2. Defendant does not suggest who should have offered the claim form.

connection to the maker of the record, and the condition of the record, that is, whether there is anything about it (erasures, alterations) which detracts from its trustworthiness. United States v. Teague, 445 F.2d 114 (7th Cir. 1971).

 Keeping in mind these guidelines, and the fact that we have a wide discretion in determining the admissibility of business records, United States v. Blake, 488 F.2d 101 (5th Cir. 1974), we turn to the facts. The witness who offered the records, Agent O'Neill, has three and one-half years' experience with the Secret Service and is familiar with the method by which claim forms are filed. He testified that he knew of nothing indicating that the Treasury Department's normal procedure was not followed here. He testified that he received the claim form from the Check Claims Division in the normal course of his duties. Twice he talked to George Jennings, a man who said he handled the affairs of Edward Griffith. Several weeks prior to trial, Jennings told O'Neill that Griffith was confined to a wheelchair, and absent-minded. On the basis of that, the government decided not to call Griffith. On cross-examination, O'Neill admitted that his opinion as to Griffith's condition was based on his conversation with Jennings. He never visited Griffith or Jennings, never confirmed the fact that Jennings was in charge of Griffith's affairs, and never verified the report on Griffith's health with authorities at the hospital where Griffith is staying.

The claim form was properly admitted into evidence. The record reached Agent O'Neill in the regular course of business. The process by which it did is simple, and there is no evidence that there were any deviations from it. There is nothing in the testimony of Agent O'Neill or in the condition of the record to detract from the reliability of the record.

### III

The government, argues defendant, had the responsibility of presenting Griffith to testify and to be confronted by defendant. By failing to present Griffith or to explain his absence by direct testimony, the government denied the defendant the right, guaranteed by the Sixth Amendment, to confront witnesses against him.

The confrontations clause of the Sixth Amendment was designed to prevent trial by *ex parte* affidavit or deposition. Such a trial denied a defendant the chance to challenge his accuser before the trier of fact. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Cases interpreting the confrontation clause have stressed the importance of the personal presence of the witness at trial (so that his demeanor may be observed) and the chance for cross-examination.

 The confrontation clause does not prohibit the admission of hearsay evidence in a criminal trial. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L. Ed.2d 213 (1970). Evidence might violate the confrontation clause even though if falls within a recognized hearsay exception. Conversely, evidence that does not meet one of the hearsay exceptions might not be violative of the confrontation clause. *Green,* supra. In a concurring opinion in *Dutton,* supra, Justice Harlan said the confrontation clause was designed to regulate trial practice and not to limit exceptions to the hearsay rule. He noted that requiring the production of available witnesses would curtail the development of the business records statute.

 A trial judge has the duty to determine whether documentary evidence is constitutionally admissible under the confrontation clause. United States ex rel. Lurry v. Johnson, 378 F. Supp. 818 (E.D.Pa.1974); United States v. Johns-Manville Corporation, supra. It is suggested that the court focus on the reliability of the proffered evidence. *Dutton,* supra. The court should "consider the offense charged, the essential elements of the offense, the character of the evidence sought to be introduced,

and, most importantly, the reliability and trustworthiness of the proffered evidence." *Johnson,* supra (378 F.Supp. at 822). The instances where evidence admissible under a hearsay exception have been held to violate the confrontation clause are rare.[3] In United States v. Tompkins, 487 F.2d 146 (8th Cir. 1973), the court, in a forgery case, allowed a check-claim form into evidence. There, however, the wife of the payee, who was familiar with the circumstances regarding the non-receipt of the check, testified as to the claim form's accuracy.

 We are aware that, because our decision on the admissibility would have an affect on the outcome on the second count, we must give this question careful consideration. *Phillips,* supra. Nevertheless, we feel that the claim form was properly admitted. The form was submitted to the Check Claims Division after the payee had complained of non-receipt and the Division had sent him the form. That the Division sent Griffith the form, processed it, and then sent it to the Secret Service Office in Pittsburgh is a partial guarantee of the form's accuracy. It is improbable that a payee would falsify such a claim.

 Griffith's unavailability must also be considered. The unavailability of an important witness may justify an exception to the right to cross-examination. *Phillips,* supra. Agent O'Neill's uncontradicted testimony indicated that Griffith was confined to a wheelchair in the VA Hospital in Butler, and that it would be very difficult for him to come to Pittsburgh to testify. Indications are that even if Griffith could have made it to Pittsburgh, his testimony, because of his absent-mindedness, would not have been helpful. Although we would have preferred if Agent O'Neill had received a doctor's or hospital report verifying Griffith's condition, enough was presented in evidence to show Griffith's unavailability and to admit the claim form in his absence.

An appropriate order will be entered.

---

3. Phillips v. Neil, 452 F.2d 337 (6th Cir. 1971), and United States v. Burress, 418 F.2d 677 (4th Cir. 1969), are two such cases.