STATE of Utah, Plaintiff and Respondent,

v.

Gillis HYGH, Defendant and Appellant.

No. 19402.

Supreme Court of Utah.

Aug. 16, 1985.

Edward Brass, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., J. Stephen Mikita, Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

Defendant Gillis Hygh appeals a conviction of aggravated robbery, a first degree felony. U.C.A., 1953, § 76–6–302 (1978). Defendant alleges that the warrantless "inventory search" of his automobile after he was placed under custodial arrest was unlawful. We agree.

At about 10:00 p.m. on December 31, 1982, a man entered a service station in Salt Lake City and asked for a pack of cigarettes. As the clerk handed the customer the cigarettes, the customer pulled a .22 caliber revolver from under his coat and ordered the clerk to empty the cash register. The clerk did so, putting approximately $350 into a paper bag. As he was emptying the register, the clerk activated a surveillance camera that had been installed by the Salt Lake City Police Department the previous month. After the robber left, the clerk called the police. The police had also been alerted to the robbery by an alarm in the police dispatcher's office which went off when the surveillance camera was activated. The police arrived shortly thereafter. The film from the surveillance camera was unloaded by a detective and taken for developing. Several of the developed pictures showing the robber's face and clothing were posted at city police stations on the line-up boards.

Immediately after the robbery, the clerk identified the robber to police as a black man wearing a rust or red colored ski mask on his head but not over his face. The robber was also wearing a khaki colored coat with "furry" lining and with a rip over the left pocket. The surveillance camera pictures showed this description to be accurate.

On January 6, 1983, a Salt Lake City police officer, Officer Foster, after stopping for a traffic light in the left lane next to defendant's car, noticed an expired rejected safety inspection sticker[1] on defendant's lower left front windshield. Officer Foster also noticed that the driver resembled the individual in the photograph of the robbery suspect posted at the police station. The officer testified at the hearing to suppress the evidence taken from defendant's car that he stopped defendant's car because of the expired safety inspection sticker.[2]

After stopping defendant's car, Foster sent a second officer to the police station to get the posted photo of the robbery suspect. Foster then checked defendant's driver's license and registration. The car was registered to defendant, but defendant had no driver's license with him. A radio

1. A rejected inspection sticker is placed on a vehicle if the vehicle does not pass the annual safety inspection. The owner of the vehicle then has five days to complete repairs and bring the vehicle back to be reinspected.

2. At the pretrial suppression hearing, Officer Foster testified: "The reason I stopped him was because of the inspection sticker." At trial, Officer Foster was asked this question: "Was the particular reason that you stopped the Defendant's vehicle, did it have anything to do with any photos that you had seen earlier that day at the police station?" He replied: "That was the reason, yes."

call to the police dispatcher verified that defendant had a license, but also revealed two outstanding misdemeanor arrest warrants against defendant. Officer Foster placed defendant under arrest on the basis of those warrants, handcuffed him, and put him in the patrol car.

Foster then ascertained that defendant's passenger was not a licensed driver and called for an impound wrecker to tow the car away.

After the second officer returned with the photo, Officer Foster conducted a search of defendant's car with the photo in his hand.[3] He did not use an inventory sheet and did not make a list of the items found in the car.[4] In the trunk, the officer found several jackets, a cap, several shirts, and a ski mask lying over the spare tire. The officer also found an unzipped plastic gym bag. The officer looked inside the bag and found a .22 caliber revolver. The gas station clerk later identified the ski mask, one of the jackets, and the gun as those used by the robber. The clerk also identified defendant as the robber. After the search of the car, Officer Foster transported defendant to the police station. Officer Foster informed the robbery detective that he believed defendant was the robber of the service station. The detective questioned defendant, then ordered Officer Foster to place defendant under arrest for aggravated robbery.

At a pretrial suppression hearing, defendant asked to have the clothing items and the revolver taken from the car suppressed as being the result of a pretextual, warrantless search. The motion was denied by the trial court on the basis that the search was a proper inventory search. At a trial before a jury, defendant was convicted of aggravated robbery. Defendant appeals, seeking a reversal of that conviction and a new trial.

■ Article I, section 14 of the Utah State Constitution, and the fourth amendment to the United States Constitution prohibit unreasonable searches and seizures. In order for a search to be constitutionally permissible, a search warrant issued by a neutral magistrate and based upon probable cause is required. There are, however, several exceptions to the warrant requirement. These include a limited search incident to a lawful arrest;[5] search of an automobile based on probable cause that it contains contraband;[6] and seizure of evidence in plain view by one with a lawful right to be in a position to so observe it.[7]

■ It is also well established that an inventory search constitutes an exception to the warrant requirement.[8] A warrantless search of an impounded vehicle for the purposes of protecting the police and public from danger, avoiding police liability for lost or stolen property, and protecting the owner's property is permitted by the fourth amendment and article I, section 14 of the Utah State Constitution.[9]

■ Because inventories promote such important interests and are not investigatory in purpose, they do not implicate "the interests which are protected when searches are conditioned on warrants."[10] Therefore, inventory searches are not per se unreasonable within the meaning of the fourth amendment and article I, section 14.

3. The record indicates that Foster searched only the trunk of the vehicle.

4. At the pretrial suppression hearing, Foster was asked: "When you impound a car, Officer, do you use an inventory sheet of some kind?" He replied: "No, I don't. Personally I don't."

5. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

6. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

7. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

8. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *State v. Cole*, Utah, 674 P.2d 119, 126 (1983).

9. *Opperman, supra* note 8; *State v. Romero*, Utah, 624 P.2d 699 (1981); *State v. Crabtree*, Utah, 618 P.2d 484, 485 (1980).

10. *Opperman*, 428 U.S. at 382–83, 96 S.Ct. at 3103–04, 49 L.Ed.2d 1000 (Powell, J., concurring).

Contraband or other evidence of crime discovered in a true inventory search may be seized without a warrant and introduced into evidence at trial.[11] However, the inventory exception does not apply when the inventory is merely "a pretext concealing an investigatory police motive."[12] Fundamental constitutional guarantees against unreasonable searches cannot be evaded by labeling them "inventory" searches.

■ In order to support a finding that a valid inventory search has taken place, the court must first determine whether there was reasonable and proper justification for the impoundment of the vehicle.[13] This justification, and thus lawful impoundment, can be had either through explicit statutory authorization or by the circumstances surrounding the initial stop.[14] If impoundment was neither authorized nor necessary, the search was unreasonable.[15]

Utah's statutes give a police department authority to impound vehicles in several situations. Vehicles may lawfully be impounded when they are used to transport controlled substances, U.C.A., 1953, § 58-37-13; when the vehicle is improperly registered or stolen, U.C.A., 1953, § 41-1-115; or when a vehicle is abandoned, U.C.A., 1953, § 41-6-116.10. No specific statutory authority exists authorizing impound of a vehicle stopped and parked on the street after the driver has been arrested. There-fore, we must look to the circumstances surrounding the stop to determine whether the impound was reasonable.

■ It is the burden of the State to establish the necessity for the taking and the inventory of the vehicle.[16] In Salt Lake City, the police department has standards set forth in a procedural order[17] whose purpose is to implement a procedure for the handling of impounds and the use of wreckers. Under this order, city police officers are directed to impound a motor vehicle of an arrested person. However, the vehicle may be released at the scene to a party designated by the owner rather than be impounded. A release form is provided to the officers to be signed by the person arrested designating an individual to take charge of the vehicle and releasing the department and its officers from all liability.

Officer Foster testified that he did ascertain that defendant's passenger was not a licensed driver. However, defendant was given no opportunity to arrange for disposition of his own car. The officer neither asked defendant whether there was someone who could come and get the car nor asked the passenger whether she could take possession of the contents of the car or get someone to come and get the car.

11. See, e.g., Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Reese v. Commonwealth, 220 Va. 1035, 1039, 265 S.E.2d 746, 749 (1980).

12. Opperman, 428 U.S. at 376, 96 S.Ct. at 3100.

13. State v. McDaniel, 156 N.J.Super. 347, 354–55, 383 A.2d 1174, 1177 (1978). See also Annot., Lawfulness of "Inventory Search" of Motor Vehicle Impounded by Police, 48 A.L.R.3d 537, 544 (1973):
   Another essential prerequisite to a valid inventory search is that the police must have taken lawful custody of the vehicle in the first instance. It has therefore been held that where the circumstances show that the police had no authority to impound the vehicle, or that police custodial care of the vehicle was not necessary, the inventory search was unlawful.
   ... [L]awful custody of an impounded vehicle does not of itself dispense with the con-stitutional requirement of reasonableness in regard to searches thereafter made of such vehicle.

14. See, e.g., Opperman, 428 U.S. at 375–76, 96 S.Ct. at 3100; Cooper v. California, 386 U.S. 58, 61–62, 87 S.Ct. 788, 790–91, 17 L.Ed.2d 730 (1967); McDaniel, 156 N.J.Super. at 355, 383 A.2d at 1177; State v. Montague, 73 Wash.2d 381, 385, 438 P.2d 571, 574 (1968).

15. See State v. Goodrich, Minn., 256 N.W.2d 506, 510 (1977).

16. People v. Nagel, 17 Cal.App.3d 492, 496–97, 95 Cal.Rptr. 129, 132 (1971). See also McDaniel, 156 N.J.Super. at 359, 383 A.2d at 1179.

17. Order Number 1–79, effective date March 1, 1979. This order in its entirety was introduced at trial.

The departmental order next establishes procedures affecting all impounds. In pertinent part, that order states:

D. PROCEDURE [A]FFECTING ALL IMPOUNDS.

1. When an impound occurs with the owner present, the officer should ask the owner if anything of value is in the vehicle, make certain the owner knows what steps are being taken to safeguard such property, and proceed as follows:

a. The officer and the wrecker driver should make a thorough inventory of the automobile, and fill in the impound slip completely, listing all necessary equipment on the car, in the car, and in the trunk.

b. Any item lying loose in the vehicle should either be turned over to the owner or locked in the trunk. Small and/or valuable items should be placed in Evidence for Safekeeping unless retained by the owner.

Officer Foster did not ask defendant if anything of value was in the vehicle or tell defendant of the steps being taken to safeguard his property. While all this was taking place, defendant was handcuffed and in Foster's patrol car. Foster thus did not give defendant any opportunity to arrange for disposition of his own property. Further, the vehicle was parked next to the curb in a lawful parking area; no valuables were visible, and defendant had not indicated any were extant; a passenger was available to remove any valuables for safekeeping at defendant's request and to arrange for a third party to remove the vehicle; the car could have been locked and left unattended; and no evidence was presented to indicate that there was a danger to police or public.[18] In this case, the State has not met its burden of showing the necessity for the seizure of the vehicle.

We are not prepared to say that a true inventory search cannot be made in the presence of the vehicle's owner and without his consent. However, if the purpose of the search is truly only to inventory the contents of the vehicle and to safeguard them during impoundment, an indicia that such is the real purpose of the search is to consult with the owner of the vehicle when he is present at the time of the impound and the search.[19]

However, even if it could be determined that the impoundment itself was reasonably necessary, the search of the vehicle trunk was nevertheless not a valid inventory search. As one commentator concluded after reviewing *Opperman:*

What is needed in the vehicle inventory context, then ... is not probable cause but rather a regularized set of procedures which adequately guard against arbitrariness.

. . . .

Inventories should not be upheld under *Opperman* unless the government shows that there exists an established reasonable procedure for safeguarding impounded vehicles and their contents and that the challenged police activity was essentially in conformance with that procedure. This means that a purported inventory should be held unlawful when it is not shown, "for [instance], that standard inventory forms were completed and kept for future reference (showing presence or absence of valuables), nor that a place of safekeeping for valuables so secured was maintained."[20]

The Salt Lake City Police Department does have a regularized set of procedures which are generally drafted to guard

---

18. *See generally* Annot., Lawfulness of "Inventory Search" of Motor Vehicle Impounded by Police, 48 A.L.R.3d 537 (1973).

19. *State v. Jewell,* La., 338 So.2d 633, 639 (1976). *Cf. Cole, supra* note 8 (after lawful impoundment of vehicle pursuant to U.C.A., 1953, § 41–1–115, officers allowed defendant to remove any items from vehicle he wished to).

20. 2 LaFave, Search & Seizure § 7.4, at 576–77 (1978) (footnotes omitted) (quoting *State v. Jewell, supra* note 19). *See also People v. Long,* 419 Mich. 636, 359 N.W.2d 194 (1984) (inventory search held invalid because of lack of standard police procedures for conducting inventory searches).

against arbitrariness by an officer in the field. However, Officer Foster did not follow these procedures. He did not involve the owner of the vehicle, who was present, in his decision. More importantly, the record indicates that he did not completely search the vehicle and did not make any kind of a list of the items in the automobile, much less use a standard inventory form. Without this, the search cannot be fairly characterized as an inventory search. In addition, Officer Foster sent another officer to the police station to retrieve the picture of the robbery suspect even before asking defendant for his license and registration, waited for the picture before beginning the search, and searched with the picture in his hand. These facts indicate that the "inventory" search was merely a pretext for a warrantless search. Under these circumstances, the evidence discovered in defendant's trunk should have been suppressed as the result of an improper, warrantless search. Defendant's conviction is thus reversed and the case remanded for a new trial.

Defendant's second point on appeal is that the trial court denied defendant his constitutional right to be confronted with the witnesses against him because defendant's counsel was not allowed to cross-examine the State's witnesses specifically regarding how the surveillance camera was activated. Defendant argued he wished to present the defense of whether, in fact, the camera was activated at the time of the robbery or could have been activated at some earlier time. The State objected to cross-examination concerning the precise method of activation, arguing that the need to maintain secrecy outweighed any need defendant might have for the information. The trial judge refused to allow cross-examination on that aspect on the ground that it was not relevant given the scope of direct examination.

At trial, the State offered as evidence photographs developed from the film taken from the surveillance camera on the night of the robbery. The gas station clerk testified that he had been instructed how to activate the camera. During the robbery, he did so while emptying the cash register of the money. The clerk further testified that he knew the camera was operating because of motor sounds and soft clicks coming from the camera. The police detective who had installed the crime-eye camera at the gas station testified that the camera was operating properly. He further testified that if the camera was activated, an alarm went off at the police dispatch office. Since installation, the camera had been activated and the alarm had gone off only twice: once on November 6 and once on December 31. The first time, on November 6, the detective had returned to the gas station, reloaded the camera, and reset it. Prior to resetting the camera, the detective made several exposures of his own face on the first few frames of the film to ensure that the camera was operating properly. The contact print of the film taken from the camera on the night of December 31 shows the face of the detective in the first few frames, then the photos identified as those of defendant. Additional testimony was adduced from several officers which established the chain of custody of the film and subsequently developed photographs. The trial judge admitted the photographs.

There are two basic theories upon which photographic evidence is admitted: the "silent witness" theory and the "pictorial testimony" theory.[21] Under the first theory, properly authenticated photographs are "silent witnesses" that speak for themselves and constitute independent, substantive evidence of what they portray, independent of a sponsoring witness.[22] Under the "pictorial testimony" theory, the photographic evidence is illustrative of a witness's testimony and only becomes admissible when a

**21.** *Fisher v. State,* 7 Ark.App. 1, 5–6, 643 S.W.2d 571, 573–74 (1982); *State v. Henderson,* 100 N.M. 260, 261–62, 669 P.2d 736, 737–38 (1983). *See also* 2 C. Scott, Photographic Evidence § 1021 (2d ed. Supp.1984); 3 J. Wigmore, Evidence § 790 (Chadbourn rev. 1970).

**22.** *Id. See also United States v. Goslee,* 389 F.Supp. 490, 493 (W.D.Pa.1975).

sponsoring witness can testify that it is a fair and accurate representation of the subject matter based on that witness's personal observation.[23]

The photos introduced at trial were introduced under the second theory. The clerk was shown two photographs taken by the surveillance camera and asked if each constituted a fair and accurate representation of the individual who committed the robbery, both the person and the clothes he was wearing. The clerk replied that those photos were the robber in the act of robbing the station. Thus, the photos were authenticated by the testimony of a witness with knowledge that the photos were what they claimed to be:[24] photos of defendant robbing the gas station.[25]

█ The right to confrontation includes the right to cross-examine witnesses.[26] However, this right is not absolute. The trial court has discretion in limiting the scope and extent of cross-examination.[27] Absent an abuse of that discretion, this Court will not disturb the ruling.

Defendant's counsel had ample opportunity to cross-examine the gas station clerk concerning the accuracy of his memory of the individual robber and clothes, whether in fact the clerk did activate the camera, and how he knew it was activated. Defendant took full advantage of that opportunity. Defendant also had the opportunity to cross-examine the police detective and officers who testified concerning the surveillance camera. The only question defendant was not allowed to ask was how specifically the camera was activated.

█ A violation of the confrontation clause does not occur unless the limitation

on the cross-examination could reasonably be expected to have a substantial effect on the jury's decision.[28] Testimony as to how the camera was activated could not reasonably be expected to have had a substantial effect on the jury's decision in the face of the clerk's testimony that the photographs depicted the man who robbed the station in the act, the clerk's personal identification of defendant as the man in the photo, and the foundational testimony authenticating the photographs. Under these circumstances, the trial court did not abuse its discretion.

Defendant's conviction is reversed and the case remanded for a new trial in accordance with this opinion.

STEWART and HOWE, JJ., concur.

ZIMMERMAN, Justice: (Concurring Separately).

I join in the Court's reversal of the conviction of defendant Hygh. The impoundment and search of defendant's automobile violated his right to be free from unreasonable searches and seizures, as guaranteed by the fourth amendment to the United States Constitution and by article I, section 14 of the Utah Constitution. However, I cannot agree with two assumptions implicit in the majority opinion: first, that the scope of the warrant requirement under article I, section 14 is congruent with that developed by the federal courts under the fourth amendment; second, that the remedy for a violation of Utah's search and seizure provision is the same as the remedy for a violation of the federal provision—exclusion of the evidence seized.

The federal law regarding warrantless searches and seizures has become a laby-

---

**23.** *Supra* note 21.

**24.** *See United States v. McNair,* 439 F.Supp. 103, 105 (E.D.Pa.1977); *Fisher,* 7 Ark App. at 6, 643 S.W.2d at 574; *People v. Perry,* 60 Cal.App.3d 608, 131 Cal.Rptr. 629 (1976).

**25.** The photographs were not purported to be introduced under the "silent witness" theory. Therefore, we do not address whether our resolution of this point would differ had the State done so.

**26.** *Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974).

**27.** *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045–46, 35 L.Ed.2d 297 (1973).

**28.** *United States v. Farnsworth,* 729 F.2d 1158, 1162 (8th Cir.1984); *Hughes v. Raines,* 641 F.2d 790, 792 (9th Cir.1981).

rinth of rules built upon a series of contradictory and confusing rationalizations and distinctions. Police officers and judges attempting to make their way through this labyrinth often imperil both the rights of individuals and the integrity and effectiveness of law enforcement. *See, e.g.,* Wermiel, *Recent Rulings Leave Police More Confused About What's Legal,* Wall St.J., August 9, 1985, at 1, col. 1. In many cases, the exclusionary rule, adopted by the federal courts as the sole remedy for fourth amendment violations, appears to have influenced, if not controlled, the scope of the constitutional right it was designed to further. Many of the arcane rules developed to justify warrantless searches seem to have been fashioned solely to avoid the consequences of the exclusionary rule.

Sound arguments may be made in favor of positions at variance with the current federal law respecting both the scope of the individual's right to be free from warrantless searches and seizures and the remedy for any violation of that right. Acceptance by this Court of such arguments under the Utah Constitution's search and seizure provision might result in simpler rules that can be more easily followed by police officers and the courts. At the same time, these rules might provide the public with greater and more consistent protection against unreasonable searches and seizures by eliminating many of the confusing exceptions to the warrant requirement that have been developed in recent years.[1]

One way to improve predictability might be to sharply limit the sweep of exceptions to the warrant requirement that often raise questions of police overreaching. In their place, clear-cut rules could be adopted—for example, a flat requirement that a warrant must be obtained before *any* nonconsensual search of property not in the immediate physical control of a suspect is conducted.[2] Such a rule would be an improvement over present law, both for the individual and for the police. The individual would be assured that, in most cases, his property would not be searched or seized unless the reasons for the search or seizure have first been presented to a neutral magistrate and a warrant issued. At the same time, police officers would not be forced to speculate about what may or may not be subject to search without a warrant. Warrantless searches would be permitted only where they satisfy their traditional justification—to protect the safety of officers or to prevent the destruction of evidence. *See, e.g., Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). Once the threat that the suspect will injure the officers with concealed weapons or will destroy evidence is gone, there is no persuasive reason why the officers cannot take the time to secure a warrant.

Such a requirement would present little impediment to police investigations, especially in light of the ease with which warrants can be obtained under Utah's telephonic warrant statute, U.C.A., 1953, § 77–23–4(2) (1982 ed.). *See State v. Lopez,* Utah, 676 P.2d 393 (1984). Perhaps most importantly, such a rule could be readily

---

**1.** Recently, the United States Supreme Court has attempted to provide police with relatively clear standards for warrantless automobile searches by sweeping away many of the subtle and inconsistent rules that governed this area. In *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the Court held that if police officers lawfully stop a vehicle, they may conduct a warrantless search of all compartments and containers within the vehicle if they have probable cause to believe that contraband is concealed somewhere in the car. In my view, this belated attempt to bring consistency and coherence to automobile searches fails because it essentially guts the fourth amendment's warrant requirement as it pertains to automobile searches. *See* 456 U.S. at 827, 102 S.Ct. at

2174 (Marshall, J., dissenting). There is little reason to believe that effective law enforcement requires this sacrifice of the interests protected by the warrant requirement. *See, e.g., The Supreme Court—1981 Term,* 96 Harv.L.Rev. 176, 184–85 (1982).

**2.** "Immediate physical control" refers to an area within which a suspect could reasonably be expected to grab a weapon or destroy evidence during an encounter with police officers. The exception would be limited by its justification and would not generally permit warrantless searches of car trunks, for example, or containers beyond the suspect's reach.

understood and complied with by police officers, and evidence uncovered in compliance with it would more than satisfy the requirements of the fourth amendment to the federal constitution.

Sound arguments can also be made against acceptance of the federal version of the exclusionary rule as the sole remedy for unlawful searches and seizures. *See generally* Coe, *The A.L.I Substantiality Test: A Flexible Approach to the Exclusionary Sanction*, 10 Ga.L.Rev. 1 (1975); Schroeder, *Deterring Fourth Amendment Violations: Alternatives to the Exclusionary Rule*, 69 Geo.L.J. 1361 (1981). Although this Court has tacitly followed the federal lead on this matter, I have found no case in which this Court has decided to adopt the exclusionary rule after independently analyzing the question of what remedy is available for an unlawful search or seizure under our state constitution. Perforce, this Court has never considered the appropriateness of possible exceptions to the exclusionary rule or the availability of alternative or supplemental remedies, such as the imposition of civil liability on police officers.

I do not suggest that without further consideration this Court should either adopt the hypothetical warrantless search and seizure rule discussed above or reject the exclusionary rule as a remedy for violations of article I, section 14. I only contend that such arguments should not be foreclosed from consideration by our unanalyzed acceptance of the federal position. The federal law as it currently exists is certainly not the only permissible interpretation of the search and seizure protections contained in the Utah Constitution.[3] If, after consideration, we conclude that we can strike a balance between the competing interests involved so as to better serve them all, then we should not hesitate to do so. *See generally* Linde, *E Pluribus—*

*Constitutional Theory and State Courts*, 18 Ga.L.Rev. 165 (1984); *see also Massachusetts v. Upton*, 104 S.Ct. 2085, 2089–91 (1984) (Stevens, J., concurring).

DURHAM, J., concurs in the concurring opinion of ZIMMERMAN, J.

---

**3.** Developing a jurisprudence of state constitutional law is not a novel idea. For example, the state of Washington has interpreted its constitutional search and seizure provisions differently than the United States Supreme Court has interpreted the fourth amendment. *See* Nock, *Seiz-*

*ing Opportunity, Searching for Theory: Article I, Section 7*, 8 U. Puget Sound L.Rev. 331 (1985). The state of Alaska has also construed its search and seizure provision to provide broader protection. *Reeves v. State*, Alaska, 599 P.2d 727, 734 (1979).