2017 UT App 42

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROMEO LUCERO OLIVAREZ,
Appellant.

Opinion
No. 20150284-CA
Filed March 9, 2017

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 131904665

Teresa L. Welch and Ralph W. Dellapiana, Attorneys
for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

MORTENSEN, Judge:

¶1 Romeo Lucero Olivarez activated his turn signal and, in one continuous movement, crossed two lanes of traffic. An officer stopped Olivarez for an illegal lane change. One thing led to another, heroin and methamphetamine were found, and Olivarez conditionally pled guilty to two counts of Possession or Use of a Controlled Substance, reserving a right to appeal the denial of his motion to suppress. On appeal, Olivarez contends that the evidence obtained during this stop, which included an inventory search of his car, should have been suppressed. We affirm.

BACKGROUND

¶2    Driving alone, Olivarez exited Interstate 15 on a four-lane off-ramp toward 900 South in Salt Lake City. For clarity we refer to the lanes on the off-ramp, from left to right while facing the direction of the flow of traffic, as lane one, lane two, lane three, and lane four. While on the exit ramp, Olivarez activated his turn signal and in one motion moved from lane two, across lane three, into lane four on the far right of the ramp. An officer in an unmarked patrol car activated his emergency lights to stop Olivarez because he "went across all the traffic without leaving the appropriate two second signal." After making a right hand turn, Olivarez pulled over on the side of the road, "outside the lane of travel," on 900 South.

¶3    The officer told Olivarez why he had stopped him and asked for Olivarez's driver license, registration, and proof of insurance. Olivarez first told the officer that he did not have his license with him. Later, when it became apparent that the officer would search Olivarez's name to check the status of his license, he told the officer that his license might be suspended. Indeed, the officer verified that Olivarez's license was "denied." The officer also verified that the car Olivarez was driving was registered to someone else. At this point, the officer decided to impound the car because Olivarez "was driving on a denied or he didn't have a valid driver's license" and because there was no other driver present to take possession of the car that Olivarez did not own.

¶4    The officer approached Olivarez to inform him that his license was "suspended or denied" and that the police were "going to impound the vehicle." Olivarez then told him that the car belonged to his brother and asked if he could call his brother to come get the car. The officer told Olivarez that "he could make his phone call once he was outside the vehicle so [the officer] could start the impound."

¶5     When Olivarez exited the car, the officer asked him if he was carrying any weapons. Olivarez informed the officer that he was carrying brass knuckles in his front pocket. Olivarez consented to a search of his person. The officer searched Olivarez and found the brass knuckles, whereupon the officer handcuffed and arrested Olivarez for carrying a concealed dangerous weapon.

¶6     After securing Olivarez in a patrol vehicle, the officer, along with other officers who had arrived, conducted an inventory search of the car in preparation for impound. The officers found "a blue flashlight . . . that contained . . . methamphetamine, heroin, and marijuana," as well as "a glass pipe that appeared to have been used to smoke narcotics." After the officers completed the inventory search, a tow truck arrived and was hooked up to the car. The registered owner of the car then arrived to pick up the car, but the officers proceeded to impound the car rather than turn it over to the owner because the impound was almost complete.[1]

¶7     Olivarez was charged with multiple offenses based on the evidence gathered during the traffic stop and inventory search. Olivarez moved to suppress this evidence, arguing that "the method by which [he] changed lanes complied with applicable Utah law" and that the officer made a "mistake in law" by requiring that Olivarez pause "for any particular time in lane 3 before going over to lane 4." Olivarez further argued that the vehicle impound was improper under both the Fourth Amendment to the United States Constitution and the Salt Lake City Police Department's impound policy because the car "was

---

1. We question the propriety of this decision, but it has no bearing on the issues before us, as the incriminating evidence against Olivarez had already been discovered by the time the owner arrived.

[in] a safe place, not blocking traffic" and because "Olivarez had called his brother and told [the officer] he wanted his brother to come take possession of the car and the officer refused to do that."

¶8 The Salt Lake City Police Department's impound policy requires officers to "use discretion in determining whether or not a vehicle should be impounded" to "avoid needless expense and inconvenience to the vehicle owner." The policy also restricts officers from impounding vehicles solely due to a lack of insurance or for an expired registration of less than ninety days when the vehicle is occupied by the owner or a responsible party.

¶9 The district court denied the motion to suppress, concluding that (1) "the stop was justified at its inception" because the officer "directly observed a traffic offense"; (2) "the officer's decision to impound the vehicle did not exceed the scope of the purpose of the stop" because "the officer determined that the driver did not have a valid license[,] that he was the only occupant[,] and that the driver was not the owner"; and (3) the officer "conducted the impound pursuant to his department impound policy."

¶10 After the court denied his motion to suppress, Olivarez entered a conditional guilty plea to possession of methamphetamine and heroin, while reserving his right to appeal the court's ruling.[2]

---

2. Under Utah law, a defendant may enter a conditional plea while reserving the right to appeal an adverse determination of a pretrial motion. *See* Utah R. Crim. P. 11(j); *State v. Sery*, 758 P.2d 935, 937–39 (Utah Ct. App. 1988).

ISSUES AND STANDARDS OF REVIEW

¶11    Olivarez appeals the denial of his motion to suppress and presents two issues. First, we must decide whether an officer has reasonable suspicion that a crime has been committed after observing a motorist signal for two seconds prior to changing multiple lanes in one continuous movement. Second, we review whether an officer may impound a vehicle in accordance with the Fourth Amendment to the United States Constitution and the Salt Lake City Police Department's impound policy where the driver is not the owner of the vehicle, has a denied license, and there are no other drivers present to take possession of the vehicle.

¶12    A court's denial of a motion to suppress presents a "mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. "While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *Id.*

ANALYSIS

I. Reasonable Suspicion for the Stop

¶13    First, we conclude that the officer had reasonable suspicion that Olivarez violated the law when he failed to signal for two seconds prior to moving from lane three to lane four. The district court therefore correctly decided that the stop was justified.

¶14    "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Police officers are justified in making traffic stops if they have "reasonable

suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (citation and internal quotation marks omitted).

¶15    To decide whether Olivarez violated the law, we look to section 41-6a-804 of the Utah Code, which governs lane changes in Utah. The statute provides, "A person may not turn a vehicle or move right or left on a roadway or change lanes until: (i) the movement can be made with reasonable safety; and (ii) an appropriate signal has been given as provided under this section." Utah Code Ann. § 41-6a-804(1)(a) (LexisNexis Supp. 2016). The statute then describes an appropriate signal: "A signal of intention to turn right or left or to change lanes shall be given continuously for at least the last two seconds preceding the beginning of the movement." *Id.* § 41-6a-804(1)(b).

¶16    We interpret statutory language "according to its ordinary and usually accepted meaning." *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (citation and internal quotation marks omitted). A statute is ambiguous when "its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis." *Id.* ¶ 15. When a statute is unambiguous "no other interpretive tools are needed." *Id.* (citation and internal quotation marks omitted).

¶17    The statute is unambiguous; it requires an appropriate signal before each lane change. Under the statute's plain language, there are three "movements" contemplated in the statute: turning, moving left or right, and changing lanes. Utah Code Ann. § 41-6a-804(1)(a). "[T]he movement," for our purposes, means a lane change. *See id.* § 41-6a-804(b). It is unreasonable to construe the statute to mean that one turn signal is sufficient for an infinite number of movements, even if all are part of a continuous series. The plain language of the statute indicates that "the movement" is singular, not plural. The statute

unambiguously states that a turn signal must be given for at least two seconds before "the movement," i.e., the lane change—a single movement, not a collective number of movements. *See id.*

¶18 Here, Olivarez changed over multiple lanes, and thus completed multiple movements as contemplated in the statute. Once Olivarez had moved from lane two to lane three, he had changed lanes—made a "movement"—and he was then required to signal for another two seconds if he desired to change lanes again.

¶19 Olivarez argues that he "complied with the clear language of Utah Code [section] 41-6a-804 by signaling before beginning his 'one continuous movement'" across multiple lanes. We disagree. This argument ignores the fact that once Olivarez had moved from lane two to lane three he had changed lanes—a "movement" as described by the statute. As explained above, a "movement" in the context of the statute means a single lane change.

¶20 Olivarez also argues that the statute only uses the term "change *lanes*," *see id.* § 41-6a-804(1)(a), (b) (emphasis added), and thus contemplates "one or more" lanes, meaning that moving across multiple lanes in one continuous movement after signaling for two seconds is appropriate. This argument, too, is unavailing. A single lane change, when expressed in a verbal phrase, is "to change lanes." The phrase "to change lane" is grammatically incorrect. Because the legislature was grammatically required to use a plural form of "lane" when expressing "lane change" in a verbal phrase, we reject Olivarez's interpretation. A single lane change will always involve more than one lane: the lane from which a driver moves, and a contiguous lane to which the driver will move. We cannot reasonably interpret the term "to change lanes" to mean "to change from one lane to any number of other lanes across the

highway." This is especially true when considering the safety hazards and unpredictable driving patterns that such an interpretation would create.

¶21     Thus, we agree with the district court that the officer observed a traffic offense and that the stop was consequently justified. Olivarez did not signal for two seconds before changing from lane three to lane four. This conduct violates Utah law. Because the officer saw Olivarez violate Utah law, the officer had reasonable suspicion to stop Olivarez. *See Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Therefore, the stop was reasonable under the Fourth Amendment. *See id.*

## II. Inventory Search

¶22     Olivarez next challenges the district court's conclusion that the officer's decision to impound the car, and thus conduct an inventory search, did not exceed constitutional limitations. We agree with the district court.

¶23     The Fourth Amendment to the United States Constitution prohibits unreasonable searches. *See* U.S. Const. amend. IV. "In order for a search to be constitutionally permissible, a search warrant issued by a neutral magistrate and based upon probable cause is required." *State v. Hygh*, 711 P.2d 264, 267 (Utah 1985). An inventory search of an impounded vehicle is an exception to the general warrant requirement. *See id.* The purpose of this exception is to "protect[] the police and public from danger, avoid[] police liability for lost or stolen property, and protect[] the owner's property." *Id.* (citing *South Dakota v. Opperman*, 428 U.S. 364 (1976)). Impounding a vehicle is constitutional only when there is "reasonable and proper justification" to impound the vehicle, "either through explicit statutory authorization or by the circumstances surrounding the initial stop." *Id.* at 268. The State concedes that there is no statutory authorization here. Therefore, we analyze the "circumstances surrounding the initial stop." *Id.*

¶24    *State v. Johnson*, 745 P.2d 452 (Utah 1987), is controlling in this matter and illustrates circumstances where there is justification to impound a vehicle. In *Johnson*, the defendant claimed that an inventory search violated his Fourth Amendment rights. *Id.* at 454. Our supreme court outlined the circumstances that justified the impound, including that the car was "parked in the middle of a motel parking lot, blocking traffic," the car "had an out-of-town temporary sticker in lieu of license plates," and that "neither [the defendant] nor his friends could properly have moved the vehicle" because the defendant "did not have a driver's license," and the defendant's friends "were under the influence of a controlled substance and were under arrest." *Id.* The court concluded, "The interest the police had in protecting themselves and the lot owners against false claims of theft was sufficient under the Fourth Amendment to justify taking an inventory . . . ." *See id.*

¶25    We similarly conclude that the inventory search of the car here did not violate the Fourth Amendment. Olivarez was lawfully stopped, was driving without a valid license, was the only person with the car when the decision to impound was made, and was not the car's registered owner.[3] Similar to *Johnson*, where no one present could properly move the vehicle, the officer here could not allow Olivarez to drive the car when he was not properly licensed. Under these circumstances, it was

---

3. As indicated, *see supra* note 1, it is immaterial to Olivarez's appeal that the owner eventually showed up because that owner did not appear until after the contraband was found. It may well be that at that point the officers should have terminated the impound process and turned the car over to Olivarez's brother, but that is a matter between the brother and the police department.

within the officer's discretion to decide to impound the car and, as a result, to undertake an inventory search of the car.[4]

¶26    We acknowledge that *Johnson* contains additional facts, which are not present here, that could weigh in favor of impounding a vehicle. In *Johnson*, the vehicle was blocking traffic, the vehicle had an out-of-town temporary sticker instead of license plates, and there was evidence of other criminal activity resulting in the arrest of the vehicle's passengers when the officer decided to impound the vehicle.[5] *See id.* But this case presents facts not present in *Johnson* that favor impounding the car—Olivarez did not own the car, nor was the owner present when the impound began. Where the owner of a vehicle is absent and the vehicle will be left parked on the side of the road, a reasonable officer may not believe that "police liability for lost or stolen property" will be avoided or that the "owner's property" will be protected, *see Hygh*, 711 P.2d at 267. The police have a legitimate interest in protecting themselves from claims of theft or loss, s*ee Johnson*, 745 P.2d at 454, especially where the owner of the vehicle is absent, *cf. State v. Weaver*, 2008 UT App

---

4. Impounding a vehicle because the driver is unlicensed is not novel. *See State v. Ashcraft*, 2015 UT 5, ¶ 5, 349 P.3d 664 (reviewing a case where the police impounded a vehicle where both the driver and passenger did not have a valid license); *State v. Lucero*, 2015 UT App 120, ¶ 2, 350 P.3d 237 (reviewing a case where an officer decided to impound a vehicle because the driver did not have a valid license); *see also In re P.S.*, 2001 UT App 305, ¶¶ 3, 5, 38 P.3d 303 (reviewing an unrelated issue in a case where an officer decided to impound a vehicle because the driver had no record of a license).

5. While Olivarez was eventually arrested for carrying a concealed dangerous weapon, he was arrested *after* the officer decided to impound the car. *See supra* ¶¶ 4–5.

101U, para. 4 ("It would be 'countersensical' to allow an individual to remove his personal belongings from a vehicle that is the subject of an inventory search before the search occurs, especially in circumstances where, as here, the individual has no ownership or verifiable possessory interest in the vehicle." (quoting *United States v. Penn*, 233 F.3d 1111, 1116 (9th Cir. 2000))). Therefore, because the impound protected the absent owner's property and protected the police from liability, the officer's decision to impound the car was a "reasonable and proper justification" under the circumstances. *See Hygh*, 711 P.2d at 268.

¶27    Moreover, a police officer is not required to stand idly by and wait a certain period of time on the off chance that the vehicle's owner will show up. It is reasonable for the officer to begin the impound process and then release the vehicle if the owner shows up, just as the Salt Lake City Police Department's policies allow.[6] Therefore, in light of the circumstances, the officer did not violate the Fourth Amendment when he began impounding the car.[7]

---

6. The Salt Lake City Police Department's impound policy states, "If the owner is incapacitated, but requests that the vehicle be released to another person, and the officer is satisfied that the other person could legally operate the vehicle, the officer may authorize release of the vehicle."

7. Olivarez relies on *Minnesota v. Gauster*, 752 N.W.2d 496 (Minn. 2008), to argue that "the impound of the vehicle was neither reasonable nor necessary because [Olivarez] made it clear that a viable alternative arrangement was available." *Gauster* held that a vehicle impound was improper, despite the fact that the owner had a suspended license, where the vehicle owner was not arrested and offered to make alternate arrangements for the vehicle. *Id.* at 507–08. However, *Gauster* is not controlling. *State v.*

(continued…)

¶28 Olivarez also argues that the Salt Lake City Police Department's impound policy restricted the officers from impounding the car. We conclude that it did not.[8] The policy requires officers to "use discretion in determining whether or not a vehicle should be impounded" to "avoid needless expense and inconvenience to the vehicle owner." In addition, the policy prohibits officers from impounding vehicles merely because of "No Insurance," or merely because of an expired registration of less than ninety days when the vehicle is occupied by the owner or a responsible party.

¶29 Because the car here was not impounded for an expired registration or lack of insurance, these restrictions are not applicable. The only relevant directive from the policy is to use discretion to "avoid needless expense and inconvenience to the vehicle owner." For the same reasons that we conclude the inventory search was reasonable under the Fourth Amendment,

---

(…continued)

*Johnson* controls here and states that, "although the police could have offered the defendant the opportunity to make other arrangements for the safekeeping of his property, their failure to do so did not eliminate the justification for taking an inventory of the defendant's property." 745 P.2d 452, 454 (Utah 1987). Further, "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983). Further still, *Gauster* is distinguishable because here the car owner was not present when the inventory search commenced.

8. Because we conclude that the officer followed department policy in exercising his discretion to impound the car, we need not analyze the legal consequence, if any, of an officer's failure to follow department policies.

*see supra* ¶¶ 22–27, we conclude that a reasonable officer could exercise discretion here and determine that the expense and inconvenience to the owner was not "needless." Olivarez did not have a valid license and, at the time the impound process began, the car's owner was not present to take custody of the car, nor was there anyone else present qualified to take possession of the car. Under these circumstances, the officer could have reasonably concluded that the cost and inconvenience of impounding the car was necessary to protect the owner's property and to avoid potential police liability.[9] *See State v. Hygh*, 711 P.2d 264, 267 (Utah 1985).

## CONCLUSION

¶30    We conclude that the district court did not err in denying Olivarez's motion to suppress. The stop was valid because the officer observed Olivarez violate a traffic law. Further, the inventory search of the car was valid because Olivarez did not have a valid driver license, the owner of the car was not present when the decision to impound the car was made, and no one else was present to take possession of the car until after incriminating evidence was discovered.

¶31    Affirmed.

———————

9. This is not to say that the decision should not have been reassessed when the owner actually appeared ready to take possession of his car.