**STATE of Utah, Plaintiff and Respondent,**

v.

**Phillip Paul LAROCCO, Defendant and Appellant.**

**No. 860172–CA.**

Court of Appeals of Utah.

Aug. 27, 1987.

Rehearing Denied Sept. 14, 1987.

Rehearings Denied Sept. 14, and Oct. 6, 1987.

Lisa J. Remal, Salt Lake Legal Defender Ass'n., Salt Lake City, for appellant.

David L. Wilkinson, Atty. Gen., Kimberly K. Hornak, Asst. Atty. Gen., for respondent.

Before GREENWOOD, ORME and BILLINGS, JJ.

## OPINION

GREENWOOD, Judge:

Defendant seeks reversal of his jury conviction of theft and possession of a stolen vehicle. Defendant contends the trial court erred in: (1) admitting evidence obtained without a search warrant; (2) refusing to grant a mistrial after a conversation between a juror and a prosecution witness; and (3) instructing the jury it could convict defendant of both theft and possession of the same stolen vehicle.

In June of 1981, a distinctive 1973 Ford Mustang was reported stolen from State Auto Sales. The theft allegedly occurred when a man who had twice previously visited the car lot was allowed by a salesman to take the car for an unaccompanied test drive. The man failed to return the car or pay for it.

In May of 1985, the same salesman saw defendant at another car sales showroom. He obtained defendant's name and address and relayed that information to the owner of the lot from which the Mustang had been stolen in 1981, a Mr. Padilla. Mr. Padilla could not locate the exact street address, but did observe the Mustang parked on the street within a couple of blocks of the address. Mr. Padilla noted the license number and called the police.

Shortly thereafter Deputy Robison, in response to Mr. Padilla's call, observed the Mustang parked in front of what proved to be defendant's home and ascertained through state licensing records that the Mustang was registered in defendant's name. Deputy Robison also checked the Vehicle Identification Number (VIN) listed with the state for the vehicle's registration, and was informed that the VIN came from a 1973 Mustang registered to a Mr. Neil Hailes.

About a week later Deputy Robison and two other officers returned to the neighborhood where the Mustang was parked. They looked through the front window at the VIN tag on the dashboard. That VIN matched the VIN identified as being that of Mr. Hailes' Mustang but did not match the VIN of the vehicle stolen from Mr. Padilla's car lot. The officers then opened the unlocked door and observed the VIN on the safety standard sticker on the inside edge of the door. This VIN differed from that on the dashboard, but matched that of the Mustang stolen in 1981 from State Auto Sales. The officers then went to defendant's home, read him his Miranda rights, and arrested him. Defendant consistently claimed he had purchased the Mustang. Subsequent investigation revealed that Neil Hailes' Mustang was totally destroyed in a car accident in December of 1975.

## I.

### SEARCH AND SEIZURE

Prior to trial and at trial defendant moved to suppress the VIN evidence obtained as a result of the warrantless search of the Mustang. The motions were denied. Defendant asserts on appeal that the warrantless search violated his United States and Utah constitutional rights to be free from unreasonable search and seizure.[1]

---

1. Language in article I section 14 of the Utah Constitution is substantially identical to that in the fourth amendment of the United States Constitution: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures

Two elements must be examined in connection with the search and seizure claim of defendant. First, we must determine if defendant has standing to challenge the legality of the search. Second, if we determine that defendant does have such standing, we must ascertain whether or not the search was legal.

## A.

### STANDING

■ The question of standing to protest an alleged unlawful search was discussed by the United States Supreme Court in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Petitioners in *Rakas* were passengers in, not owners of, a car which was searched by police without first obtaining a warrant. The search produced a rifle and shells used as evidence to convict petitioners. In arguing that the evidence should have been suppressed, petitioners urged the Court to adopt the rule that a person has standing to prevent a warrantless search when the search is "directed" against that person or the person is legitimately on the premises at the time of the search. The Court did not agree, finding that fourth amendment rights are personal and do not extend to the search of another's premises or property. *Id.* 439 U.S. at 133, 99 S.Ct. at 425. The Court refused to expand the exclusionary rule to vicarious use and stated the standard as being "whether the person who claims protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. at 430. The "legitimate expectation of privacy" test continues to be the usual measure utilized in federal and state search and seizure proceedings.

Federal circuit courts have also examined standing to object to search and seizure in fact situations somewhat similar to the case herein. In *Simpson v. United States,* 346 F.2d 291 (10th Cir.1965), the police, suspecting defendant had stolen a vehicle, arrested him for vagrancy and investiga-

tion of car theft and jailed him. While defendant was in jail, the police conducted a warrantless search of the vehicle, which produced evidence of violation of the Dyer Act. Based on that evidence, defendant was convicted under the Dyer Act of interstate transportation of a stolen vehicle. In reversing the trial court's denial of the motion to suppress the evidence, the court rejected the notion that defendant could not protest the search because the car was stolen, as such reasoning would mean that police could conduct searches at will. The result would be that

> of all defendants prosecuted for automobile theft, only those who actually owned the automobiles could raise Fourth Amendment objections successfully. Moreover, the proof of ownership would be sufficient to quash the prosecution for theft of the automobile. These constitutional rights belong to the guilty as well as the innocent. (citation omitted). The sole prerequisite to a defendant's raising the Fourth Amendment issue is that he claims a proprietary or possessory interest in the searched or seized property.

*Id.* at 294.

The Ninth Circuit also discussed standing of one accused of auto theft to object to search of the alleged stolen vehicle. The court stated that "a person accused of a Dyer Act violation as the defendant was here has automatic standing to contest the validity of search or seizure of a vehicle or its contents where possession of the vehicle forms the basis of the charge." *United States v. Jamerson,* 549 F.2d 1263, 1269 (9th Cir.1977).

The Tenth Circuit later reached a different result in *United States v. Erickson,* 732 F.2d 788 (10th Cir.1984). In *Erickson,* evidence obtained from a warrantless search of an airplane was deemed admissible. The court stated that "no testimony showed that the defendant had anything to do with Emery Air Freight or that he was authorized by Emery to possess, use, or fly the aircraft. Thus, defendant failed to

shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to

be searched, and the person or thing to be seized." Utah Const. art. I, § 14.

show lawful possession of the plane giving rise to a legitimate expectation of privacy." *Id.* at 790. *Erickson* was subsequently cited in *United States v. Obregon*, 748 F.2d 1371, 1375 (10th Cir.1984), where defendant was in sole possession and control of a car rented by another. The court found defendant had no standing to object to a search of a car which was rented by someone else.

The Utah Supreme Court has also examined standing to object to a warrantless search and seizure. In *State v. Montayne*, 18 Utah2d 38, 414 P.2d 958 (1966), defendant rented a car under a false name and failed to return it when due. Defendant was stopped by a police officer who knew he was a parolee. After determining that the car was rented under a name other than that of defendant and that it was overdue for return, the police officer arrested defendant for car theft. He then searched the car and found evidence which defendant sought to have suppressed. The Court held that because defendant's lack of ownership of the car was established prior to the search, defendant had no standing to object to the search. The fourth amendment can be invoked only by one who can establish that he was a victim of an invasion of privacy. *Id.* 414 P.2d at 960. Similarly in *State v. Purcell*, 586 P.2d 441 (Utah 1978), the searched vehicle was known to have been stolen prior to its search. The Court stated that "[d]efendant simply lacks standing in court to attack the warrant as to the search of the stolen automobile, since on the facts before us, defendant had absolutely no possessory or proprietary interest therein that could have been invaded." *Id.* at 443.

In *State v. Valdez*, 689 P.2d 1334 (Utah 1984), use of evidence obtained from a vehicle which the defendant was driving was challenged under both the Utah and United States Constitutions. The search was upheld because defendant stated he did not own the car and demonstrated no expectation of privacy in the effects searched. Most recently, in *State v. Constantino*, 732 P.2d 125 (Utah 1987), police officers saw defendant and another person in a car. Police knew that defendant had a suspend-ed driver's license and that the other occupant was wanted on an arrest warrant. They arrested both occupants and impounded the car, which belonged to a third person. An inventory search revealed marijuana. The Court held that the evidence was admissible as defendant had no right to possession of the car, it was registered to another and there was no indication that defendant had been given permission to drive the vehicle. The Court stated: "Absent claimed right to possession, he could not assert any expectation of privacy in the items seized and had no standing to object to the search." *Id.* at 127.

These Utah cases have been decided under both the United States and the Utah Constitutions' search and seizure provisions. In each Utah case where the search was upheld it was clearly established and not disputed prior to the search that defendant did not own or did not have an interest in the property searched. These cases are distinguishable from those where defendant asserts ownership of the property, or otherwise an interest giving rise to a "legitimate expectation of privacy." We agree with the reasoning in *State v. Constantino*, that there must be at least a claimed right to possession in the property. In addition, consistent with the reasoning of *Simpson v. United States*, we believe that the fourth amendment and its Utah counterpart would be rendered farcical if police officials were allowed to engage in warrantless searches of property for the ultimate purpose of proving that property stolen.

In this case, prior to the search, police knew that the car was registered in defendant's name and that it was parked in front of defendant's home. Only the search itself corroborated other information indicating that it was the stolen vehicle. Under these circumstances where defendant has not declared beforehand that he has no interest in the vehicle, and where proving that the car was stolen is one of the critical facts to be established at trial, we hold that the defendant has standing to challenge the legality of the search.

## B.

### LEGALITY OF SEARCH

■ We now turn to the question of whether the search, as actually conducted, violated defendant's constitutional rights. The parties stipulated that two officers first looked through the windshield of the vehicle and noted a VIN which did not match that of the stolen car. They then opened the unlocked driver's door and noted a VIN on the safety sticker which did match that of the stolen car. No further search of the car's interior was conducted.

The legality of the search of a VIN has been addressed in several cases. In *Glisson v. United States*, 406 F.2d 423 (5th Cir.1969), defendant was in jail on another matter when police officers first searched a truck suspected to have been stolen by defendant. The officers opened the front door of the truck and noted the VIN on the inside of the door. They tried to locate an identification number in other locations on the truck, but were unable to do so. The court observed that "[m]anufacturers place confidential numbers in several hidden locations and they correspond with the more obvious, identification number placed just inside the door on the drivers side of the vehicle." *Glisson*, 406 F.2d at 424. After discussing the issue of whether or not the defendant had standing to move for exclusion of evidence obtained in this initial search of the vehicle, the court found the search illegal for the following reasons: (1) the vehicle was in a truck park while the defendant was in jail; (2) opening the door of the truck was not incidental to an arrest; (3) no emergency existed; (4) there was no danger that evidence would be removed or destroyed; and (5) the identification number was not needed for police bookkeeping records. *Id.* at 428.

*United States v. Polk*, 433 F.2d 644 (5th Cir.1970) also involved testimony from a police officer as to a VIN on a stolen vehicle. In *Polk*, the evidence was ruled admissible because: (1) the car door was not locked; (2) no damage occurred as a result of the police inspection; (3) there was no search of private areas of the vehicle, such as the glove compartment; (4) there was no seizure of the vehicle; (5) there was no infringement of other property rights as the car was in a repair garage; (6) the owner of the garage consented to the inspection; and (7) there was no infringement of free movement as the car was not stopped in transit. *Id.* at 646–47. The court discussed the purposes of VINs, including aiding law enforcement personnel in tracing vehicles. The court then found that

> [t]here can therefore be no reasonable expectation of privacy with respect to the identity of the VIN. Opening the car door, looking under the hood, or crawling under the car to inspect the rear axle does not independently bring an inspection of the VIN within the scope of the Fourth Amendment.

*Polk*, 433 F.2d at 647. The court further observed that a car is not like a home. Much of the interior and all of the exterior is in view of the public and not protected. "Although opening the [unlocked] door of the car may involve a technical trespass, such action does not invade any expectation of privacy." *Id.* at 647–48.

The United States Supreme Court considered the legality of a warrantless search for a VIN in *New York v. Class*, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986).[2] Police stopped a speeding car with a cracked windshield. The officer opened the car door to look for the VIN on the doorjamb, as he could not see the dashboard VIN through the cracked windshield. When the officer did not find the VIN on the doorjamb, he moved papers aside on the dashboard which obscured the VIN. In this process he observed a gun in the car protruding from underneath the driver's seat. The state used the gun as evidence in convicting defendant of illegal possession of a weapon. Appeal was based on

---

**2.** The Court's main opinion was joined by a narrow majority. J. O'Connor delivered the opinion of the Court joined by C.J. Burger, J. Blackmun, J. Powell and J. Rehnquist. J. Powell concurred, joined by C.J. Burger. J. Brennan filed a dissent joined by J. Marshall and J. Stevens, and J. White dissented joined by J. Stevens.

denial of defendant's motion to suppress. The Court discussed at length the purposes served by VINs and the federal statute requiring that all automobiles have a VIN in plain view of someone outside the car. 49 C.F.R. § 571.115 (1984). Justice O'Connor, speaking for the majority, observed that "the State's intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" *Id.*, 106 S.Ct. at 965 (quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). The Court found a lesser legitimate expectation of privacy in automobiles than other locations because of the physical characteristics of automobiles. Their function is transportation, not as a repository of personal effects. Consequently, the Court found no reasonable expectation of privacy in the VIN on the dashboard. *Id.* 106 S.Ct. at 965–66. Covering the VIN with papers could not change the result, as an attempt to hide what was not subject to privacy would not render it private.[3] The Court did say, however, that the remainder of the car's interior was subject to fourth amendment protection, and an intrusion therein would be a "search." *Id.* at 966. The Court held that the search for the VIN is not a "search" within the meaning of the fourth amendment because of the lack of reasonable expectation of privacy, but then explained that the subsequent seizure of the gun,

which was in plain view, was justified by the safety factor. *Id.* at 967–68.

The Court noted that VINs are, by law, either inside the door or on the dashboard. "Neither of those locations is subject to a reasonable expectation of privacy. The officer here checked both those locations, and only those two locations.... He [the officer] did not even intrude into the interior at all until after he had checked the door jamb for the VIN." *Id.* at 968. The Court clearly stated that VINs, whether on the dashboard or the car door, may be inspected by police without a warrant, so long as the intrusion is for that limited purpose, because there is no legitimate expectation of privacy in a VIN.[4] *Id.* at 968–69.

In the case before us, the officers could have easily obtained a warrant for the search of the car. There was no indication that the car would not be available, as defendant had no idea that officers had been checking the car or investigating the possibility that it was a stolen vehicle. Indeed, he apparently had contentedly used the automobile as his own for years. No other factors existed which would have otherwise justified a warrantless search. However, we are bound by *Class* to conclude that the search was valid.[5] The record indicates that the intrusion was minimal. Officers only opened the door and recorded the VIN. They did not search the interior of the car. The inspection was much less intrusive than that allowed in *Class*, which involved entry into the car. Although ordinarily the mere existence of probable cause would not justify a warrant-

---

3. We note that the legitimate governmental purposes served by readily visible VINs would be defeated if persons were able to insulate them from inspection by obscuring them.

4. The Supreme Court in *Class* stated that the doorplate VIN as well as the dashboard VIN is "ordinarily in plain view of someone outside the automobile." 106 S.Ct. at 968. This is of course true only if the door is sufficiently ajar to permit the doorplate to be viewed. It seems clear that the Supreme Court would find no distinction of constitutional significance in moving obstructions so a dashboard VIN could be seen and moving the car door so a doorplate VIN could be seen. Indeed, if anything, the latter is less intrusive as the plane defining the interior of the car is not crossed and the interior, there-

fore, not physically penetrated. Nor must the officer make an election as to which VIN source he will view. In *Class*, as here, the officer "checked both those locations, and only those locations." *Id.* at 968.

5. It is perhaps true, as the dissent suggests, that the same result would be reached if the instant case were analyzed under the standards articulated in *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). However, because this case is factually closer to *Class* and because *Class* is more narrowly drawn and thus presents a less drastic departure from previously decided fourth amendment cases, we are more comfortable premising our decision on *Class*.

less search, *Class* finds that the existence of probable cause coupled with a nonintrusive examination of a VIN legalizes such examination.[6] Therefore, we hold that the search was legal and that denial of defendant's motion to suppress was proper.[7]

## II.

### JUROR MISCONDUCT

· ▮▮ Defendant contends that mistrial should have been declared when it was discovered that a juror had a conversation with a witness during the trial. The record indicates that after jury selection and just prior to the commencement of trial, a juror and Mr. Hailes, a prosecution witness, had a brief, casual conversation. Mr. Hailes told the juror he planned to go to Eureka, Utah and hoped the trial would not last too long. He also said he was surprised that none of the jurors had indicated, when asked, that they felt police officers were more believable than other people. Mr. Hailes told the juror he probably would have responded affirmatively to that question. When questioned in chambers by the trial court judge about the conversation, the juror declared that the conversation had not produced any bias and that she could fairly assess the evidence without regard to the conversation. The judge denied defendant's motion for a mistrial.

The problem of juror/witness contact was examined in an early Utah case in which a prosecuting witness had driven a juror to and from the court throughout the two week trial. *State v. Anderson,* 65 Utah 415, 237 P. 941, 942 (1925). Affida-

vits of both stated they had not discussed the trial and that the juror had not been influenced in any way. The Utah Supreme Court noted that the Utah Constitution, art. I, § 12, guarantees trial by an impartial jury. The witness in *Anderson* was one whose testimony was critical to the prosecution. The Court remanded for a new trial, stating that

> any conduct or relationship between a juror and a party to an action during trial that would or might, consciously or unconsciously, tend to influence the judgment of the juror authorizes and requires the granting of a new trial, unless it is made to appear affirmatively that the judgment of the juror was in no way affected by such relationship or that the parties by their conduct waived their right to make objection to such conduct.

*Id.* 237 P. at 943.

In *State v. Durand,* 569 P.2d 1107 (Utah 1977), three jurors had coffee in a sheriff's office on two occasions when officers who were witnesses in the case were present. Both the jurors and the officers testified that there had been no conversation about anything pertaining to the case. The Utah Supreme Court stated that they strongly disapproved of the conduct, as even the appearance of misconduct should be avoided. The Court nevertheless held that "notwithstanding a showing of minor impropriety or irregularity there should be no reversal of a conviction unless it appears that a party has been prejudiced in that in the absence of such impropriety there is a reasonable likelihood that the verdict would

---

6. Justice Brennan's dissent in *Class* focuses on a perceived lack of probable cause to search for the VIN. The record here has no comparable lack. The officers knew, prior to their second visit to the subject car, that the VIN on the state's registration records for the vehicle belonged to a 1973 Mustang registered in the name of Neil Hailes, not defendant. Additionally, the vehicle had distinctive markings identical to those of the stolen vehicle.

7. The Utah Supreme Court has, to date, decided search and seizure cases argued under a Utah constitutional theory consonant with decisions under the United States Constitution's fourth amendment, eschewing a different standard. *See State v. Hygh,* 711 P.2d 264 (Utah 1985);

*State v. Valdez,* 689 P.2d 1334 (Utah 1984). We agree with the dissent that any departure from this approach should be announced by our state's supreme court, not this Court. We further agree that it is in the context of vehicular searches, which the federal courts have treated with inconsistency, or worse, where consideration of some departure from the course set by the federal courts in interpreting the federal constitution would be most appropriate. We do not agree that adherence to federal doctrines in this case works a result so egregious as to make this case the one where plenary consideration is given to whether our state's constitution requires something more, or different, than the fourth amendment to the federal constitution.

have been different." *Id.* at 1109. The Court found that the trial court had thoroughly examined the incidents and determined that no prejudice against defendant resulted. That determination was given deference and affirmed by the Court.

A different conclusion was reached in *State v. Pike*, 712 P.2d 277 (Utah 1985). There the Court found that a mistrial should have been granted where a juror talked to a witness. The *Pike* Court explained that "[a]nything more than the most incidental contact during the trial between witnesses and jurors casts doubt upon the impartiality of the jury and at best gives the appearance of the absence of impartiality." *Id.* at 279-80. The Court stated that Utah has adopted a stringent rule that "prejudice may well exist even though it is not provable and even though a person who has been tainted may not, himself, be able to recognize that fact." *Id.* at 280. The Court stated that in Utah the rule is that any improper contact between a juror and a witness creates a rebuttable presumption of prejudice. This presumption arises after any contact "which goes beyond a mere incidental, unintended, and brief contact." *Id.* at 280. In applying the presumption, the Court found that, even though there was no conversation about the trial between the witness, who was the arresting officer, and the juror, the effect of the contact was "breeding a sense of familiarity" which could affect the credibility of that witness with that juror. The Court held the juror's denial of prejudice or influence was, therefore, insufficient to overcome the presumption, and the mistrial should have been granted.

In the present case, the witness, Mr. Hailes, who talked to the juror, was admittedly a minor witness whose testimony was uncontroverted. He testified that he had owned a Ford Mustang with the same VIN as was on the dashboard of the subject Mustang, and that his Mustang had been destroyed in an accident. The critical issue, therefore, appears to be the content of the conversation, which involved the credibility of police officers as compared with others. Based on *Pike*, we must examine whether or not the state successfully rebutted the presumption of prejudice created by the contact. The state argues that the presumption was successfully rebutted for three reasons: (1) the juror stated she was not influenced by the contact; (2) Mr. Hailes was not a key witness nor in such a respected position that he would likely be influential; and most importantly, (3) the testimony presented at trial by police officers was uncontroverted, so that their credibility was not an issue.[8] The trial judge listened to the testimony and arguments regarding possible prejudice. We find that he reasonably determined that the state had sustained its burden of demonstrating that no prejudice against defendant resulted from the contact.

### III.

### LESSER INCLUDED OFFENSES

■ Defendant also argues that the trial court improperly allowed the jury to convict him of both theft of an operable motor vehicle and possession of a stolen vehicle because the possession charge is a lesser included offense of the theft charge. Theft of an operable motor vehicle is a second degree felony under Utah Code Ann. § 76-6-404 (1978) and possession of a stolen vehicle is a third degree felony under Utah Code Ann. § 41-1-112 (1982). Defendant contends that under § 76-1-402 (1978) he should not have been convicted of both offenses. That section states:

(3) A defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required

---

**8.** Police officers offered testimony and evidence to establish that the car was stolen. Defendant did not dispute that the car was stolen and the jury was not asked to decide that issue. Defendant denied he was the person who stole the car.

The question to be decided by the jury, therefore, was whether or not defendant had stolen the car, which issue did not hinge on the credibility of the police officers' testimony.

to establish the commission of the offense charged....

Defendant was charged with theft which occurred in 1981, and possession of a stolen vehicle occurring in 1985. A "single criminal episode" is defined as "all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective." Utah Code Ann. § 76–1–401 (1978). Because of the remoteness in time of the two offenses, section 76–1–402(3) cannot bar the multiple convictions, as that section is limited to and defined by "separate offenses arising out of a single criminal episode." Defendant also argues that the offenses should have been alternative pursuant to the reasoning advanced in *State v. Hill*, 674 P.2d 96 (Utah 1983). In *Hill*, the Utah Supreme Court considered whether or not defendant should have been convicted of both aggravated robbery and theft. The Court stated that "the greater-lesser relationship must be determined by comparing the statutory elements of the two crimes as a theoretical matter and, where necessary, by reference to the facts proved at trial." *Id.* at 97. If it appears that the greater crime could not have been committed without necessarily committing the lesser there can be only one conviction.

If the facts were that the possession charge arose from possession of stolen goods immediately after or close in time to the theft of those same goods, we might be persuaded by defendant's arguments and the applicability of *Hill*. However, where the events occurred four years apart and where there were intervening circumstances and perhaps intervening possessors of the stolen goods, the argument fails. The crime of theft by no means includes retention and possession of the stolen goods for a period in excess of four years. Therefore, we find that it was proper to allow the jury to convict defendant on both charges.

The judgment of the trial court is affirmed.

ORME, Judge: (concurring).

I concur fully in the main opinion. I write separately to expand upon why, in my judgment, the juror-witness contact in this case does not require reversal.[1]

As I read *State v. Pike*, 712 P.2d 277 (Utah 1985), two preliminary and two more substantive inquiries are relevant in considering whether the presumption of prejudice has been rebutted. Preliminarily, the questioning of the juror and/or witness must be exhaustive and "disclose the entire contents of the conversation." *Id.* at 280. In addition, a complete transcript must be made and provided on appeal. *Id.* These preliminary requirements were both met in this case. The trial court's examination was thorough and penetrating, eventually eliciting, as the dissent points out, disclosure of the comments about police officer credibility. Moreover, both the prosecutor and defense counsel asked further questions of the juror. The complete examination was transcribed and is part of the record before us.

The more substantive inquiries are 1) whether the witness is "an important prosecution witness," and 2) "the scope and subject matter of the conversation." *See id.* Moreover, there is interplay between these two inquiries: The more important the witness, the less relevant the subjects discussed by the witness and juror. Thus, in *Pike*, the subject discussed, namely a backyard slip-and-fall sustained off-duty, was itself quite harmless. Nonetheless, because of the importance of the witness, as "both the arresting officer and a witness at the scene of the altercation," *id.*, Pike's conviction was reversed. Although the backyard slip-and-fall was unrelated to the proceedings, the discussion "had the effect of breeding a sense of familiarity that could clearly affect the juror's judgment as to credibility." *Id.* at 281.

---

1. In so stating, I acknowledge the question is a close one. I also note my agreement with the dissent that the preferred course in this case would have been to excuse the juror and seat one of the available alternates. In this area, trial courts should err on the side of caution to avoid even the least doubt about the jury's impartiality. All such problems are avoided, as the dissent observes, if jurors are rigorously segregated from witnesses.

In the instant case, the witness Hailes was quite unimportant. As explained in the main opinion, his limited testimony was confined to mundane and undisputed matters. Accordingly, his credibility was wholly inconsequential. Whether a juror had "a sense of familiarity" with Hailes or considered him a very scoundrel, he was not a pivotal witness and the verdict would clearly be the same, regardless of his preceived credibility. Stated another way, his testimony was inherently credible and was not challenged or controverted by defendant, making Hailes a minor, rather than an important, witness.

Even where, as here, the witness is so unimportant that the impact of increased familiarity on his credibility is inconsequential, attention must be given to the "scope and subject matter of the conversation" between juror and witness. *Id.* at 280. Of key concern in this case is Mr. Hailes' remark about the believability of police officers. While it is likely the unsolicited comment was dismissed out of hand by the juror, consistent with the strict approach of *Pike* we need to assume, for purposes of analysis, that the comment prompted reflection by the juror on the veracity of police officers and the conclusion that perhaps police officers were, after all, more believable than witnesses generally. As the dissenting opinion observes, "police officers are generally the most important witnesses for the prosecution," and in the typical criminal case an observation such as the one made by Hailes, however gratuitous and innocently intended, would render the presumption of prejudice all but impossible to rebut.

Here, however, the officers were no more important as witnesses than Hailes. Unlike the officer in *Pike*, who not only effected Pike's arrest, but also was a key witness to the events which led to his discharging a shotgun at a car driven by rowdies, the police witnesses in this case, as explained in note 8 to the main opinion, testified to matters not in dispute. Their testimony, if believed, established that the car found at defendant's home was stolen. However, whether or to what extent they were believed was of no moment, since defendant conceded the car was stolen, albeit not by him. Testimony tying defendant to the original theft was offered exclusively by witness Luce, and it was the credibility of Luce, not the police officers, which mattered.[2] This is best emphasized by defendant's closing argument, which was devoted to a lengthy discussion of perceived problems with Luce's identification of defendant as the person who drove off with the Mustang, while omitting any reference to the police officers' testimony.

As I see it, the state has demonstrated that Hailes was not an important witness and that, in the peculiar context of this case, the subjects discussed by the juror[3] and witness were inconsequential. These factors, when coupled with the juror's unqualified expression that she had not been influenced by the conversation with Hailes, serve to rebut the presumption of prejudice which arises under *Pike*.

BILLINGS, Judge: (concurring in part and dissenting in part).

I agree with Part III of the majority opinion and the decision reached by the majority that defendant had standing to challenge the constitutionality of the search of the Mustang and therefore join in Part 1A of the court's opinion. Although I concur in the result reached by the majority that there was no unconstitutional search, I disagree with important parts of the analysis. I further respectfully dissent from Part II of the majority opinion where my colleagues find that a juror's conversation with a prosecution witness on the merits of the proceeding was not grounds for a mistrial. I believe the juror misconduct

**2.** By contrast, had Hailes commented about the high degree of believability of used car salesmen, I would go the other way. Mr. Luce was an important witness and his credibility, memory, and identification were material.

**3.** I do not share the dissent's concern about possible taint of a second juror. It is clear from the record that the second juror walked away as Mr. Hailes sat down to "share an ashtray" with the one juror with whom he then struck up conversation.

denied the defendant a fair trial and would therefore reverse.

## JUROR MISCONDUCT

I am persuaded that the trial judge should have substituted an alternative juror or declared a mistrial as a result of a prosecution witness' substantial conversation with a juror on the merits of the case. I agree with the majority that our analysis of whether this unauthorized contact denied the defendant a fair trial is controlled by the recent Utah Supreme Court case of *State v. Pike*, 712 P.2d 277 (Utah 1985). However, we read *Pike* differently. In *Pike*, the defendant's conviction was reversed when a prosecution witness, in response to a juror's question as to why he was limping, simply stated: "I told him I had bunged my toe and he asked me how I did that and I told him about slipping in my backyard on the water and breaking [it]." *Id.* at 279. In finding that this encounter prejudiced the defendant's right to a trial by an impartial jury and required reversal, the supreme court stated:

> We have long taken a strict approach in assuring that the constitutional guarantee of a fair trial not be compromised by improper contacts between jurors and witnesses, attorneys, or court personnel.
>
> . . . .
>
> Anything more than the most incidental contact during the trial between witnesses and jurors casts doubt upon the impartiality of the jury and at best gives the appearance of the absence of impartiality.
>
> . . . .
>
> [P]rejudice may well exist even though it is not provable and even though a person who has been tainted may not, himself, be able to recognize that fact.
>
> The rule in this jurisdiction is that improper juror contact with witnesses or parties raises a rebuttable presumption of prejudice.

*Id.* at 279–80 (citations omitted).

The court gives two reasons for this strict standard. First, it is extremely difficult for an appellant to prove how and to what degree a juror has in fact been influenced by a contact with a witness. Such influence may subconsciously affect the juror's judgment as to credibility and therefore the mere statement from the juror that the contact did not affect his decision does not suffice to rebut the presumption of prejudice. Second, the judicial process suffers from the appearance of impropriety resulting from a juror's conversation with a witness. Participants and observers are left to wonder whether the defendant really received a fair trial. For these reasons, the court concludes that prejudice must be presumed whenever a contact goes beyond a mere incidental, unintended and brief encounter. *Id.* at 280.

The court's strong language in *Pike* requires close scrutiny and clear assurance that the presumption of prejudice is overcome if the contact is substantial: "Indeed, even if the jurors had denied that they were influenced by the encounter in the post trial hearing, it is not enough to rebut the presumption of prejudice." *Id.* at 281.

*Pike* further instructs that the presumption of prejudice attaches regardless of what was actually said between the juror and the witness. *See id.* at 279. The conversation in *Pike* was brief and did not involve the merits of the case and yet the court found that the presumption of prejudice required reversal.

The facts before this court are more egregious than those in *Pike*. In this case the exchange was lengthier, involved a prosecution witness, and went to the merits of the proceedings. When questioned by the trial court the juror described his conversation with Mr. Hailes, the prosecution witness:

> Well, first of all, he pulled the light switch in the hall and mentioned that it worked, and then he did the other switch. And then he was saying he hoped it didn't—the case didn't go long, that he was going to Eureka, just driving down there, where I lived.

Later, the juror also recalls that Mr. Hailes asked her if she had served on a jury

before. Like the conversation in *Pike* this encounter "no doubt had the effect of breeding a sense of familiarity that could clearly affect the juror's judgment as to credibility". *Id.* at 281.

The trial judge's questioning of the juror supports the supreme court's concern in *Pike* that jurors might not know when they have been prejudiced and would be hesitant to admit the taint. When first asked whether there was any conversation about the case the juror states "no nothing." Further along in the examination, the juror continues to insist "the case wasn't mentioned at all." Finally, just as the exchange with the judge is about to terminate, the juror volunteers:

> He did mention one thing. That he was surprised at the questions that were asked. And that he was surprised because he, himself, would have said yes when you (judge) asked if we would believe a policeman more than any other person. That was the only comment that was made.... When the judge asked if we would believe a policemen more than any other person, and he said he probably would have raised his hand.

The majority agrees that the above-described encounter was more than a "brief incidental contact" which would raise the presumption of prejudice.

The majority, in a conclusory statement, finds that "[t]he trial judge listened to the testimony and arguments regarding possible prejudice. We find that he reasonably determined that the state had sustained its burden of demonstrating that no prejudice against defendant resulted from the contact." Perhaps the majority adopts the state's arguments that (1) the juror stated she was not influenced by the contact; (2) Mr. Hailes was not a key witness; and (3) the testimony presented at trial by the police officers was uncontroverted and therefore their credibility was not an issue. I believe each argument fails.

First, under *Pike* a mere denial of prejudice by the juror is insufficient to rebut the presumption, particularly when, as here, the juror has difficulty admitting the extent of her conversation.

Second, Mr. Hailes was not a minor, unimportant witness. Mr. Hailes' testimony was an essential part of the circumstantial web of evidence which persuaded the jury that the defendant stole the Mustang. He testified that the VIN glued to the defendant's dashboard and seized by the police came from a Mustang which belonged to him and which he had demolished on Christmas Eve 1975. Mr. Hailes' testimony established the sequence of when and how the VIN was available to the defendant. The testimony supported the state's theory that the defendant removed the VIN from the wrecked Mustang to cover up his possession of the stolen Mustang.

Third, and most crucial in my decision that the presumption of prejudice was not rebutted in this case, is the subject matter of the juror-witness exchange. Mr. Hailes' comment on the credibility of the two police officers who testified at trial goes to the core of this criminal case. The majority infers that because no one directly controverted the officers' testimony they were not important witnesses and therefore their credibility was not at issue. I cannot agree. These two police officers initiated the investigation of the defendant, gathered the evidence which was presented to ultimately convict the defendant, and testified about their efforts for the prosecution at trial. It is only common sense, and I believe all jurors understand, that police witnesses are testifying for the state and against the criminal defendant. In fact police officers are generally the most important witnesses for the prosecution. I believe the comment on the credibility of police witnesses went to the heart of this circumstantial case against the defendant.

Furthermore, the record is unclear whether there was another juror who overheard Mr. Hailes' comments. This other juror was not called and questioned by the trial judge. Again, as in *Pike*, we do not have a complete picture of the contacts below.

*Pike* inferentially directs trial judges to segregate jurors from witnesses, parties, and attorneys. In fact the trial judge in

this proceeding after this initial problem states that he will isolate his jurors. Furthermore, this incident occurred and was called to the attention of the court before the trial began. The court, with little difficulty, could have replaced both tainted jurors with alternates.

In conclusion, I find that the encounter between Mr. Hailes and the questioned juror created a presumption of prejudice. Because the contact went to the substance of the proceedings, and the record does not persuade me the presumption of prejudice was rebutted, I would reverse for a new trial by an impartial jury. ·

## CONSTITUTIONALITY OF THE SEARCH

The defendant challenges the constitutionality of the search of the Mustang and the consequent discovery of the incriminating VIN under both the United States and Utah Constitutions.

The majority finds that the defendant had no reasonable expectation of privacy in the VIN discovered after opening his car door, and then concludes there was no search within the meaning of the fourth amendment. I disagree with the majority's reading of *New York v. Class*, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (5–4 decision), which they conclude compels this conclusion.

A brief repetition of the facts relevant to the search in this case is important to demonstrate that *Class* does not require the majority's holding. In 1973, a new Ford Mustang was taken from a dealer for a test drive and never returned. Four years later, the salesman involved recognized the defendant and believed he was the man who had stolen the Mustang from the salesman's previous employer, Mr. Padilla. The salesman relayed the information to Mr. Padilla who located the defendant's place of residence.

Mr. Padilla found a 1973 Ford Mustang parked near the defendant's residence matching the unique characteristics of the stolen vehicle including: distinctive arm rests, tie downs on the hood, a black racing stripe on the hood and sides of the car, and a scoop on the front of the car. Mr. Padilla wrote down the license number of the car and notified the police. In response, Detective Robison went to defendant's neighborhood and saw the 1973 Mustang with the same license number and the aforementioned unique characteristics parked on the street. Robison continued her investigation by running the plate number and receiving the registered VIN. Six days later Detective Robison, accompanied by others, returned to the defendant's neighborhood and again found the unique Mustang parked on the street. It is undisputed that defendant had no knowledge that he or his car was under investigation.

The officers peered through the windshield and read the VIN mounted on the dashboard. There was no visible evidence of tampering or anything suspicious about the placement or condition of the dashboard VIN. The VIN did not match the vehicle stolen from Mr. Padilla's lot. Nevertheless, the officers opened the car door and observed the VIN on the inside edge of the door. This VIN matched that of the stolen Mustang. The officers then arrested the defendant.

*Class* does not compel the majority's conclusion that the defendant under the circumstances of this case had no reasonable expectation of privacy in the *second* VIN located inside his car. In *Class*, two police officers observed the defendant driving in excess of the speed limit with a cracked windshield in violation of New York law. Class was pulled over by the police. After the stop, and after Class' exit from the vehicle, and because the officers could not read the dashboard VIN from the outside because of a cracked windshield and covering papers, one officer reached into Class' vehicle to remove papers on the dashboard in order to read the dashboard VIN. While moving the papers, the officer observed a gun protruding from under the driver's seat.

*Class* does not clearly articulate when one has a reasonable expectation of privacy in a VIN located inside his automobile because the focus of the alleged unconstitutional search in *Class* is the gun. Never-

theless, the reasoning of the Supreme Court in *Class* persuades me that defendant had a reasonable expectation of privacy in the VIN located inside his car after the officers had read the VIN on his dashboard from outside the car and found nothing out of the ordinary which would justify a further search.

Justice O'Connor carefully limits her holding in *Class* in order to write for a splintered Court:

> [W]e must decide whether, in order to observe a Vehicle Identification Number (VIN) *generally visible from outside an automobile,* a police officer may reach into the passenger compartment of a vehicle to *move papers obscuring the VIN* after its *driver has been stopped for a traffic violation and has exited the car.* We hold that, in *these circumstances,* the police officer's action does not violate the Fourth Amendment.

*Id.* 106 S.Ct. at 962–63 (emphasis added).

The Court emphasizes that under 49 C.F.R. § 571.115 (1984) a VIN must be located on the dashboard visible from the exterior of the vehicle and thus concludes that it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile. *Id.* at 966.

Although the Supreme Court uses the term VIN loosely, I do not believe the Court intended that an officer may open the door to a vehicle *after* he has already read and recorded a VIN visible from the exterior of the car without triggering fourth amendment protections. As the Court states: "a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions from the police. We agree that the intrusion into that space constituted a 'search.'" *Id.* at 966. The Court continues:

> We note that our holding today does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile. *If the VIN is in the plain*

*view of someone outside the vehicle, there is no justification* for governmental intrusion into the passenger compartment to see it.

*Id.* at 969 (emphasis added).

The police, in opening the door to the 1973 Ford Mustang, conducted a search subject to fourth amendment protection because the VIN on the dashboard was clearly visible and did not appear abnormal upon inspection. This is not an unimportant technicality in analysis. Under the majority's view, police may at random and without probable cause search cars under the pretext of finding another VIN as there would be no search subject to fourth amendment protection.

If, as the majority infers, the fourth amendment still prohibited all warrantless searches of vehicles except upon a finding of (1) probable cause for the search; and (2) exigent circumstances, I would find the opening of the Mustang's door and the discovery of the incriminating VIN an unconstitutional search. However, I believe that under *California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), and its progeny, the "automobile exception" to the search warrant requirement of the fourth amendment has been expanded to encompass this case. Under *Carney,* anything on wheels can be subjected to a search without a search warrant, provided the officers have probable cause for the search. Exigent circumstances are now presumed because of the vechicle's potential mobility.

In *Carney,* the majority concluded:

> In short, the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met.

*Id.* 105 S.Ct. at 2070.[1]

In the instant case, the police officers had probable cause to suspect that the

---

1. Cases subsequent to *Carney* have interpreted the Supreme Court's decision broadly. Most imply that the "automobile exception" to the fourth amendment allows for warrantless

Mustang searched was stolen. Detective Robison received a call from the owner of the Mustang who explained that a former salesman had identified the defendant as the person who had failed to return a car after an unaccompanied test drive. Mr. Padilla, the owner, located the unique Mustang near the defendant's home. Detective Robison confirmed that the Mustang was registered in the defendant's name. About a week later, the officers returned to the neighborhood where the Mustang was parked. It matched the owner's description of the stolen car. It had distinctive arm rests, tie downs on the hood, a black racing stripe on the hood and sides of the car, and a scoop on the front of the car. Although the majority agrees there was no reason why the officers should not have gotten a search warrant and no traditional exigent circumstances, this is no longer fatal to the search. Under the standard established by the United States Supreme Court in *Carney*, the search was reasonable under the fourth amendment as there was probable cause to believe the car was stolen.

To date the Utah Supreme Court, in applying article I, § 14 of the Utah Constitution to warrantless vehicle searches, has followed the interpretation previously given to the fourth amendment by the United States Supreme Court. *See State v. Hygh*, 711 P.2d 264, 267 (Utah 1985). I must, therefore, reluctantly concur in the decision of the majority that the search was not unconstitutional. However, I do not believe that Utah *must* continue to accept the United States Supreme Court's constantly changing interpretation of federal search and seizure law in interpreting its own constitution. This change in direction, however, must come from the supreme court of this state.

Because I suggest a re-examination of Utah law in light of *Carney*, a brief history of the "automobile exception" to the search warrant requirement of the fourth amendment is appropriate. Article I, § 14 of the Utah Constitution and the fourth amendment of the United States Constitution use identical language to protect their citizens against unreasonable searches and seizures. Historically, these constitutional mandates have meant that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). *See State v. Christensen*, 676 P.2d 408, 411 (Utah 1984).

The "automobile exception" to the search warrant requirement of the fourth amendment was first articulated by the United States Supreme Court in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *Carroll*, the Court concluded that where it is not practicable to secure a warrant, because the vehicle will be quickly moved out of the jurisdiction (exigent circumstances), and when the officer has probable cause to believe that the vehicle is involved in criminal activity, no search warrant is required. *Id.* 267 U.S. at 151–52, 45 S.Ct. at 284–85.

In *Coolidge*, the Court, while ultimately concluding that the "automobile exception" was irrelevant to the facts, implicitly reaffirmed the two-prong test of exigent circumstances plus probable cause:

> The word "automobile" is not a talisman in whose presence the Fourth Amendment fades away and disappears. And surely there is nothing in this case

searches of automobiles if the search is reasonable in scope and supported by probable cause. There is no longer a need to demonstrate exigent circumstances as they are presumed from the wheels on the vehicle. *See, e.g., United States v. Grandstaff*, 807 F.2d 851, 856 (9th Cir.1987); *United States v. Hamilton*, 792 F.2d 837, 842–43 (9th Cir.1986); *United States v. Hepperle*, 810 F.2d 836, 840 (8th Cir.1987) (rejected

appellant's argument that no exigent circumstances existed because the automobile was in disrepair and was incapable of being moved finding that probable cause is all that is necessary to justify a warrantless search); *State v. Badgett*, 200 Conn. 412, 512 A.2d 160, 169 (1986); *State v. Cain*, 400 N.W.2d 582, 585 (Iowa 1987); *State v. Akers*, 723 S.W.2d 9, 13 (Mo.App.1986).

to invoke the meaning and purpose of the rule of *Carroll v. United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the imagination can this be made into a case where "it is not practicable to secure a warrant...."

*Coolidge*, 403 U.S. at 461–62, 91 S.Ct. at 2035 (citations omitted).[2]

As discussed previously, *California v. Carney* dramatically expanded the circumstances where warrantless searches of motor vehicles will be allowed by eliminating the requirement of exigent circumstances. Because of the recent, radical restriction of the fourth amendment's protection against unreasonable searches and seizures of automobiles in *Carney*, it may well be time for the Utah Supreme Court to reconsider its position.

Following the previous federal standard, Utah law has required a finding of both probable cause and traditional exigent circumstances to justify the search of a vehicle without a warrant. *State v. Christensen*, 676 P.2d 408, 411 (Utah 1984) (Justice Stewart writing for the court determined that "[w]arrantless searches and seizures are per se unreasonable unless exigent circumstances require action before a warrant can be obtained.... [T]he police must have probable cause to believe that the automobile contains either contraband or evidence of a crime *and* that they may be lost if not immediately seized.") (emphasis added); *State v. Limb*, 581 P.2d 142, 144 (Utah 1978) ("Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search."); *accord State v.*

*Cole* 674 P.2d 119, 123 (Utah 1983); *State v. Shields*, 28 Utah2d 405, 503 P.2d 848, 849–50 (1972).

The Oregon Supreme Court has observed that "[w]hen this court gives Oregon law an interpretation corresponding to a federal opinion, our decision remains the Oregon law even when federal doctrine later changes." *State v. Caraher*, 293 Or. 741, 653 P.2d 942, 946 (1982). By the same token, the State of Utah need not change its search and seizure law merely because the United States Supreme Court has seen fit to change the corresponding federal law.

In interpreting its own constitution, a state is not bound by the interpretation given by the United States Supreme Court to similar language in the federal constitution. *See, e.g., Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *State v. Brooks*, 638 P.2d 537, 539 (Utah 1981). The Utah Supreme Court has clearly accepted this principle:

Although Article I, § 24 of the Utah Constitution incorporates the same general fundamental principles as are incorporated in the Equal Protection Clause, our construction and application of Article I, § 24 are not controlled by the federal courts' construction and application of the Equal Protection Clause. Case law developed under the Fourteenth Amendment may be persuasive in applying Article I, § 24, but that law is not binding so long as we do not reach a result that violates the Equal Protection Clause.

*Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984) (citations omitted).

State courts responding to the confusing and restrictive new federal interpretations are relying on an analysis of their own search and seizure provisions to expand constitutional protection beyond those mandated by the fourth amendment, often di-

---

**2.** Justice White in his dissent in *Coolidge* argued that the confusing morass of legal technicalities surrounding warrantless searches of automobiles should be eliminated. He proposed the adoption of a simple rule—a search of a movable vehicle without a warrant would be *per se* reasonable so long as the police had probable

cause for the search. *Coolidge,* 403 U.S. at 527, 91 S.Ct. at 2068 (White, J., dissenting).

Justice White's views were essentially adopted by the Supreme Court in the recent case of *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

rectly avoiding applicable United States Supreme Court precedent. *See, e.g., State v. Caraher,* 293 Or. 741, 653 P.2d 942, 947 (1982); *State v. Glass,* 583 P.2d 872, 876 (Alaska 1978); *State v. Kaluna,* 55 Hawaii 361, 520 P.2d 51, 58 (1974); *People v. Beavers,* 393 Mich. 554, 227 N.W.2d 511, 516 (1975), *cert. denied* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975); *O'Connor v. Johnson,* 287 N.W.2d 400, 405 (Minn.1979); *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216, 1220 (1978); *State v. Hunt,* 91 N.J. 338, 450 A.2d 952 (1982); *State v. Kock,* 302 Or. 29, 725 P.2d 1285, 1287 (1986); *State v. Benoit,* 417 A.2d 895, 899 (R.I.1980); *State v. Opperman,* 247 N.W.2d 673, 674 (S.D.1976).

Justice Zimmerman recently criticized the federal approach to warrantless searches: "The federal law regarding warrantless searches and seizures has become a labyrinth of rules built upon a series of contradictory and confusing rationalizations and distinctions." *Hygh,* 711 P.2d at 271–72 (Zimmerman, J., concurring); *see also State v. Johnson,* 60 Utah Adv.Rep. 30, 33 (Utah 1987) (Zimmerman, J. concurring).

While it is true that the United States Supreme Court's decision in *Carney* has simplified the federal approach to the automobile exception under the fourth amendment, it has done so at the sacrifice of the rights of the citizens of this nation to be secure in their effects against unreasonable searches and seizures. The warning of Justice Jackson should be heeded:

> [Fourth amendment rights] ... are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowering a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

*Brinegar v. U.S.,* 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting).

Following many of her sister state courts, the Utah Supreme Court may take this opportunity to simplify Utah's vehicle search and seizure law without gutting the protection it provides to the citizens of this state. *See State v. Earl,* 716 P.2d 803, 805 (Utah 1986). Warrantless vehicle searches could be restricted to only those situations where they serve their original purpose of protecting police officers and preventing the immediate destruction of evidence. *State v. Hygh,* 711 P.2d 264, 272 (Utah 1985) (Zimmerman, J., concurring).